1  JOSEPH W. COTCHETT (SBN 36324)
   jcotchett@cpmlegal.com
2  ANNE MARIE MURPHY (SBN 202540)
   amurphy@cpmlegal.com
3  BLAIR V. KITTLE (SBN 336367)
   bkittle@cpmlegal.com
4  VASTI S. MONTIEL (SBN 346409)
   vmontiel@cpmlegal.com
5  **COTCHETT, PITRE & McCARTHY, LLP**
6  840 Malcolm Road
   Burlingame, California 94010
7  Telephone:    (650) 697-6000
   Facsimile:    (650) 697-0577
8

9  *Attorneys for Plaintiffs*

10              **UNITED STATES DISTRICT COURT**

11              **NORTHERN DISTRICT OF CALIFORNIA**

12

13

14  **ALENA CRUZ**, an individual; and
    **SHANNON PAYNE**, an individual,
15
    Plaintiffs,
16
              v.
17  **PBF ENERGY INC., a Delaware Corp.;**
    **PBF ENERGY WESTERN REGION LLC,**
18  **a Delaware Co.;**
    **MARTINEZ REFINING COMPANY LLC,**
19  **a Delaware Co.**
20  Defendants.
21

22

23

24

25

26

27

28

| CASE NO: |
| --- |
| **CLASS ACTION** |
| **CLASS ACTION COMPLAINT** |
| 1. **Violations of the Clean Air Act** |
| 2. **Medical Monitoring** |
| 3. **Environmental Monitoring** |
| 4. **Liability For Ultrahazardous Activities** |
| 5. **Negligence** |
| 6. **Public and Private Nuisance** |
| **DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT**

## TABLE CONTENTS

PAGE NO.

I.      INTRODUCTION ........................................................................................... 1

II.     JURISDICTION AND VENUE ..................................................................... 9

III.    THE PARTIES ............................................................................................. 10

        A.   PLAINTIFFS ........................................................................................ 10

        B.   DEFENDANTS ..................................................................................... 12

IV.     FACTUAL ALLEGATIONS ...................................................................... 13

        A.   A SERIES OF EQUIPMENT FAILURES AT THE REFINERY LEAD TO THE NOVEMBER 24-25, 2022 FALLOUT ........................................................ 13

        B.   MRC FAILED TO REPORT THE TOXIC EMISSIONS PER STATE AND FEDERAL REGULATIONS; HEALTH OFFICIALS LEARNED OF THE EVENT FROM RESIDENTS ........... 18

        C.   DEFENDANTS SHRUGGED OFF THE SEVERITY OF THE REFINERY FAILURE, OFFERING RESIDENTS FREE CAR WASHES ............................... 19

        D.   MONTHS AFTER THE DISASTER RESIDENTS WERE ADVISED NOT TO EAT ANYTHING GROWN IN THE COMMUNITY ........................................ 20

        E.   DEFENDANTS ARE REPEAT ENVIRONMENTAL OFFENDERS ............. 20

        F.   NOTICE ............................................................................................... 21

V.      CLASS ACTION ALLEGATIONS .............................................................. 22

VI.     TOLLING OF THE STATUTES OF LIMITATIONS ................................. 25

VII.    CLAIMS FOR RELIEF ............................................................................... 26

        FIRST CLAIM FOR RELIEF
        Violation of the Clean Air Act
        42 U.S.C. §7401 et. seq.
        (ON BEHALF OF THE CLASS AGAINST ALL DEFENDANTS) ...................................... 26

        SECOND CLAIM FOR RELIEF
        REQUEST FOR MEDICAL MONITORING - CONTAMINATION
        (ON BEHALF OF THE CLASS AGAINST ALL DEFENDANTS) ...................................... 28

        THIRD CLAIM FOR RELIEF
        REQUEST FOR ENVIROMENTAL MONITORING
        (ON BEHALF OF THE CLASS AGAINST ALL DEFENDANTS) ...................................... 29

        FOURTH CLAIM FOR RELIEF
        STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES
        (ON BEHALF OF THE CLASS AGAINST ALL DEFENDANTS) ...................................... 29

        FIFTH CLAIM FOR RELIEF
        NEGLIGENCE
        (ON BEHALF OF THE CLASS AGAINST ALL DEFENDANTS) ...................................... 31

        SIXTH CLAIM FOR RELIEF
        PUBLIC AND PRIVATE NUISANCE
        (ON BEHALF OF THE CLASS AGAINST ALL DEFENDANTS) ...................................... 33

CLASS ACTION COMPLAINT                                                               i

**VIII.    PRAYER FOR RELIEF** ............................................................................ 34

**IX.    DEMAND FOR JURY TRIAL** ..................................................................... 36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Plaintiffs Shannon Payne and Alena Cruz (collectively, "Plaintiffs"), on behalf of themselves and the plaintiff Class described herein, bring this individual and class action Complaint against Defendants PBF Energy Inc., PBF Energy Western Region LLC, and Martinez Refining Company ("MRC") (collectively, "Defendants" or "PBF Energy"), and allege as follows:

## I.    INTRODUCTION

1.    Plaintiffs are individuals and members of families who for decades have lived in the shadow of Defendants' Martinez oil refinery (the "Refinery"), a facility with an extensive history of environmental violations. Repeatedly, Plaintiffs have been exposed to toxic substances spewing out of the Refinery, while no one has stepped in and stopped Defendants from sending toxins into their community. The Refinery continues to experience upsets and disruptions that cause toxic clouds of dust to disperse over its neighbors and create an increased risk of harm to their health. All one has to do to see the potential for disaster in Martinez, is to look at the neighboring facility in Richmond which spewed more toxic substances into the air just yesterday. Martinez, like Richmond, is an inevitable disaster waiting to repeat itself.



*The refinery in Richmond, as seen on November 27, 2023 flaring event.*

Source: https://www.nbcbayarea.com/news/local/chevron-refinery-flaring-richmond/3382183/

LAW OFFICES
Cotchett, Pitre &
McCarthy, LLP





*The refinery in Martinez, as seen during December 2022 flaring event.*
Source: https://alertca.live/cam-console/2333 and
https://twitter.com/925mlbfan/status/1601381566730543104

2.      It is time to stop Defendants' futile risk management practices, which have resulted in the Refinery repeatedly experiencing upsets that poison the surrounding community. It is also time to hold Defendants to account for their cavalier failure to timely report these incidents to the public and regulators. Plaintiffs, on behalf of themselves and a class of similarly situated individuals, bring this lawsuit seeking compensation for their damages to date, for medical monitoring, for environmental monitoring, and for a declaration that Defendants' mismanagement of their facility has created and continues to pose a public and private nuisance. Plaintiffs also seek injunctive relief to compel Defendants to cease operations at the Refinery until a verified plan is in place to ensure it no longer contaminates the surrounding community; and to create an independent oversight board given access to data on measurements and modeled predictions of toxic exposures from the Refinery to independently evaluate the level of risk and exposure to the adjacent community from the Refinery's operations.

3.      The Refinery has a history of regulatory violations dating from both Defendants' ownership and their predecessor, Shell Oil Products US ("Shell"). For example, in May 2018, Shell entered into a consent decree with the U.S. EPA related to multiple violations, including failure to accurately analyze worst-case release scenarios and multiple violations based upon

failing to immediately give notice of hazardous releases.[1] *See* **Exhibit A**, attached. On July 6, 2018, a flaring incident at the Refinery resulted in issuance of a health advisory for the local community.[2] It was later found that the incident was more dangerous than Shell had acknowledged.[3] In December 2019, Shell entered into a Consent Order with the California State Department of Toxic Substances Control over, *inter alia*, Shell's operating the Refinery so as to allow hazardous waste fly ash to escape into the environment and mislabeling containers of spent catalyst hazardous waste. *See* **Exhibit B**, attached. In January 2020, Shell sold the Refinery to Defendants for $1.2 billion.[4] Since then, the problems have continued, including repeated hazardous material spills.[5]

4.      Within the past year, there have been multiple incidents where the Refinery has discharged airborne toxic substances over the surrounding community. This suit is warranted due to a lack of transparency from Defendants and community distrust of regulatory health agencies around these releases and the risk they represent to the community, leading to continued public alarm and uncertainty over the risk of toxic exposures to the public. These continuing toxic releases show that Defendants are not the corporate good citizens they claim. This suit is necessary to ensure accountability and protect public safety.

5.      On November 24, 2022, as families in Martinez were enjoying Thanksgiving festivities, a toxic cloud was erupting from the smokestacks of the Refinery, blanketing the region with a powdery, toxic layer of dust, later identified as "spent catalyst." The release continued into the morning hours of Friday, November 25, 2022. Ultimately, it is believed that 20 to 24 tons of this "spent catalyst" were released over the community with potential serious medical impacts.

---

[1] https://www.epa.gov/archive/epa/newsreleases/us-epa-requires-bay-area-refinery-improve-waste-management-pay-penalty.html.
[2] https://www.kqed.org/science/1926961/health-advisory-lifted-for-martinez-pacheco-after-shell-refinery-shutdown.
[3] https://www.kqed.org/news/11685038/malfunctions-at-shells-martinez-refinery-more-serious-than-first-reported.
[4] https://www.ogj.com/refining-processing/article/14092900/shell-finalizes-sale-of-martinez-refinery.
[5] *See* California Office of Emergency Services spill reports at https://www.caloes.ca.gov/office-of-the-director/operations/response-operations/fire-rescue/hazardous-materials/spill-release-reporting/.

6.      Contra Costa County Health ("CCH") officials found that Defendants broke the law by failing to immediately notify the county[6] of the toxic release. The county said that it learned about the disaster from <u>social media postings</u> by residents documenting the fallout when they awoke the day after Thanksgiving.[7] **<u>Defendants ignored their statutory duty to immediately alert regulators so that steps could be taken to alert the community and keep it safe</u>**.

7.      Lab tests conducted on collected samples of the November 2022 chemical release showed that the catalyst contained elements such as oxygen, silicon, aluminum, carbon, magnesium, and sulfur, and heavy metals such as nickel, vanadium, chromium, and zinc. Heavy concentrations of all these heavy metals were found in the spent catalyst dust, indicating high toxicity, impurities, and health threatening particles that have a long-lasting physiological impact.

8.      The environmental disaster is so serious that the **Federal Bureau of Investigation** ("FBI"), the **U.S. Department of Justice** ("DOJ"), and the **U.S. Environmental Protection Agency** ("EPA") have been brought in to aid in a coordinated investigation, which sent federal agents going door to door in the community soliciting information about the disaster.[8] Agents handed out cards with QR codes, which they asked residents to complete.



---

[6] Unless otherwise specified, "county" refers to the Contra Costa county.
[7] *Id.*
[8] https://www.mercurynews.com/2023/05/27/fbi-epa-investigating-hazardous-chemical-release-from-martinez-refinery/

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



***Picture of federal agents proceeding door to door asking residents to provide information to investigators regarding the harmful release of spent catalyst by Defendants***
Source: EXCLUSIVE: FBI launches investigation into Thanksgiving Day chemical release from Martinez Refinery - ABC7 San Francisco (abc7news.com)

9.      Following the November 22, 2022 event, the public nature of the inquiry and subsequent response put Defendants, the Administrator of the EPA and the State of California on notice pursuant to the Clean Air Act. (42 U.S.C. § 7604)

10.     The Bay Area Air Quality Management District ("BAAQMD") has published modeling of where the ash plume may have travelled over an approximately 15-mile swath of county:

**Where dust from the Martinez refinery could have traveled on Nov. 24-25**
This map was created by the Bay Area Air Quality Management District and intended for soil sampling purposes. The blue areas reflect weather modeling from the time.

Source: https://www.sfchronicle.com/bayarea/article/martinez-refinery-white-dust-map-17893393.php

11.     According to the modeling, the heaviest concentrations likely fell in the population center of Martinez (with a population of nearly 40,000 people) and could have also reached Alhambra Valley and Franklin Canyon areas, as well as El Sobrante, Hercules and, in Solano County, Benicia and Richmond.

12.     CCH has acknowledged limitations in the modeling, including that the exact timing of the event is not fully known, and the sizes of the catalyst particles are also not fully known. Since the release heavy rains have deluged the Bay Area, the BAAQMD notes that the rains likely swept the contamination into other areas.

13.     Since the November 2022 disaster, "the Contra Costa County Health Department has alerted residents that the dust — a byproduct of the gasoline, diesel and jet fuel refined at the facility — actually contained aluminum, barium, chromium and other hazardous metals. Those chemicals are linked to nausea, vomiting, respiratory issues, immune system dysfunction, cancer and even death."[9]

---

[9] https://www.mercurynews.com/2023/05/27/fbi-epa-investigating-hazardous-chemical-release-from-martinez-refinery/ (last accessed June 6, 2023).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

14. A few weeks after the disaster, and as more details emerged about the toxic composition of the ash, the Refinery went through a period of dramatic flaring. Defendants claimed the flaring was meant to burn off deposits as part of an "ongoing special operation."

15. Once again, on the morning of **July 11, 2023**, at approximately 8:30 am, the Refinery began spewing petroleum coke dust into the air, blanketing nearby properties with fine, dark-colored dust. As with prior incidents, **<u>Defendants did not immediately report the release to regulatory agencies, instead waiting two hours to make a report</u>. <u>Residents of the surrounding community, including Plaintiffs, did not learn about this incident from public agencies, as should have happened. Instead, they learned about it by waking up that morning to find their homes and properties covered with a layer of black dust containing unknown toxic compounds</u>.**[10]

16. Less than two weeks later, on July 22, 2023, the Refinery again spewed petroleum coke dust into the air. It remains unknown the extent to which the release properties adjacent to the Refinery.

17. Investigation of the July 11th and July 22nd releases is ongoing.[11] Initial information indicates the dust released was petroleum coke, a byproduct of the refining process and a known carcinogen. What continues to be unknown is the level of risk and exposure to the surrounding community from these events.

18. The following is a timeline of key events:

| DATE | EVENT |
|---|---|
| **November 21, 2022** | On November 21, 2022, the Refinery had an equipment failure, described as a feed diversion in the Catalytic Cracking Unit ("CCU") causing it to be on hot standby. Defendants do not disclose this at the time. |

---

[10] https://www.baaqmd.gov/~/media/files/compliance-and-enforcement/incident-reports/2023/incidentreport_mrc_07112023_final-pdf.pdf?la=en&rev=9519d0853d6746ce9943c5adaef679ee.
[11] Martinez refinery petroleum coke release prompts hazmat investigation - CBS San Francisco (cbsnews.com) (last accessed July 17, 2023).

| | |
|---|---|
| **November 23, 2022** | The Refinery began the process of re-introducing feed around 12:10 a.m. The Refinery started the process with the introduction of torch oil to the regenerator. |
| **November 24, 2022** | Although not disclosed at the time, the Refinery continued to have major equipment failures, including failure of its pollution control devices. The Refinery began releasing a course, large particle, white/gray substance into the community that contained high amounts of heavy metals. The exact time the release started has not been disclosed by the Refinery but is estimated at 9:30 p.m. MRC later stated that the release was of "spent catalyst," going on to claim that it was primarily alumina silicate, clay and other minerals mined from the earth. "Spent" refers to the minerals that have been incinerated at high temperatures to "remove impurities" so the catalyst can be reused. (Later investigation uncovered the highly toxic nature of the plume). |
| **November 25, 2022** | Citizens from the City of Martinez and surrounding areas wake up to ash falling from the sky and covering all outdoor surfaces. Pollutants continue to spew from at least two stacks; Defendants do not alert regulators or the public.<br><br>Defendants allegedly begin their investigation. Their eventual incident report states that there was approximately 20-24 tons of "spent catalyst" released from the MRC CCU on November 24 and 25, 2022.<br><br>Defendants begin collecting samples and information from the community. |
| **November 29, 2022** | The City of Martinez states it is monitoring the situation, including work being done by Contra Costa Health ("CCH") and the Bay Area Air Quality Management District ("BAAQMD"). |
| **November 30, 2022** | Martinez shares a press release from CCH, indicating that tests of the "spent catalyst" show higher than normal levels of aluminum, barium, chromium, nickel, vanadium, and zinc (all chemicals that are hazardous to human health). |
| **December 7, 2022** | CCH makes a presentation to the Martinez City Council. |

| December 9, 2022 | An explosion and flaring incident at the MRC are reported around 5 p.m. CCH, the Contra Costa County Sheriff's Department and the Fire Protection District along with the Air District are among the agents who respond. Defendants report to officials on scene that the flaring event was likely due to the failure of a compressor. |
|---|---|
| December 14, 2022 | The City releases a press release from CHH declaring the spent catalyst a "Major Chemical Accident." |
| December 18, 2022 | The City sets up a webpage to keep the community apprised regarding the environmental disaster. |
| January 5, 2023 | CCH formally requests the county District Attorney's office to consider legal action against MRC regarding the Thanksgiving disaster. |
| January 18, 2023 | CCH begins the process of forming an oversight committee related to the disaster. |
| March 7, 2023 | The City notifies residents that they should refrain from eating fruit and produce grown near MRC. |
| April 5, 2023 | The BAAQMD provides maps based on modeling to show where the toxic fallout may be present. |
| July 11, 2023 | The Refinery again erupts, this time spewing spent petroleum coke dust over the surrounding neighborhood. As in the past, this time MRC waited 2 hours before alerting regulators. |
| July 22, 2023 | The Refinery again malfunctions and releases spent petroleum coke dust, with as yet unknown impacts on adjacent properties. |

## II.    JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are 100 or more members of the proposed class.

20.    This Court has personal jurisdiction over all Defendants. Defendants are registered to conduct business in California and do regularly conduct business there.

21.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because Defendants transact business in this District, and because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of California.

## III.    THE PARTIES

### A.    Plaintiffs

22.     Plaintiff **Alena Cruz**, a resident of the City of Martinez for over a decade, lives with her husband and two children near the Refinery. The presence of the Refinery and its regular contamination of their community has often caused them harm. Every time the refinery has a blowoff, the windows of her house shake and she fears that more toxins are being released into her family's environment. She can often see large flames from her house and the street where she lives when the refinery has flaring events.

23.     Ms. Cruz also suffered many harms when the Refinery spewed coke dust earlier this year. Alena has been growing vegetables in her garden for over 5 years, and was not notified by Defendants that their toxins had spewed into her garden until months after the incident. The only notice she received from Defendants that they had spewed toxins into her community was when representatives from the refinery stopped by a family members' house and offered free detailing and cleaning to a car that had been exposed to the dust. Even though she received no official notice, she suspected something was wrong when her vegetables did not yield as much as they had in previous years, and parts of her plants died mysteriously. Ms. Cruz and her family ate vegetables contaminated by the dust.

24.     Ms. Cruz also suspected something was wrong when she noticed dust over her cars and property, but without official notification from the Refinery, did not know how to react.

25.     Ms. Cruz is afraid that Defendants and the Refinery are hiding information about their pollution from the public. She has ultimately removed her vegetable garden as she no longer believes she can trust the refinery to notify the public when it contaminates the environment. She has also experienced the mysterious onset of health problems since the incident including more severe allergies than usual and fears that the contamination from the refinery is negatively affecting her and her families' health.

26.    Plaintiff **Shannon Payne**, a lifelong resident of Martinez, has suffered her whole life from the negative effects of the Refinery's pollution of her home.

27.    Ms. Payne has lived in Martinez for over 30 years, and is a 4th generation Martinez citizen and direct descendant of the founding "Martini" family. She currently lives with her mother and children in Martinez – not far from the Refinery.

28.    Ms. Payne's children were all born and raised in Martinez. Her family has experienced mysterious ailments including her youngest son having asthma his whole life, her mother developing breast cancer twice despite no family history, and Ms. Payne has herself experienced unexplained pneumonia. All of Ms. Payne's Martinez-residing family members have experienced respiratory issues of some kind.

29.    Every time the refinery has "blown up" Ms. Payne has had had to clean soot and other particulates from the windows of her house and from her cars as she lives downwind from the refinery.

30.    Like Ms. Cruz, Ms. Payne's family has a garden. Months after the most recent release, representatives from the Refinery came to Ms. Payne's house and offered $250 to replace the soil in her family garden. Like Ms. Cruz, Ms. Payne's family had no notice from the refinery that pollution had been released until months later when representatives knocked on the door and offered compensation for the pollution they had caused.

31.    Also like Ms. Cruz, Ms. Payne's family was eating vegetables from the garden before they found out about the contamination. Ms. Payne's family ate contaminated strawberries, zucchini, squash, lettuce, and peppers, among other things.

32.    In her long tenure in Martinez, there have been at least 15 times where refinery dust landed on her property. Ms. Payne has also felt numerous Refinery explosions that have shaken her windows.

33.    Ms. Payne's entire Martinez-residing family has respiratory issues that have continued since the Refinery's most recent release of toxic chemicals. They have experienced burning eyes, running nose, which have all increased since the most recent release.

34.     Throughout all this, Ms. Payne has not directly received any emergency alerts that would explain to the residents of Martinez what is going on at the Refinery.

35.     Ms. Payne is also concerned about the potential health effects of the Refinery's continued release of pollutants.

36.     As a result of their fear and the Defendants' continued pollution of the environment, Ms. Payne has not grown anything in the family garden this season.

**B.     Defendants**

**Defendant PBF Energy, Inc.**

37.     Defendant PBF Energy, Inc. ("PBF Energy") is a Delaware corporation headquartered in Parsippany, New Jersey. In February 2020, after the acquisition of Defendant MRC and the Refinery, PBF Energy currently owns and operates six domestic oil refineries and related assets with a combined processing capacity (known as throughput) of approximately 1,000,000 barrels per day.

**Defendant PBF Energy Western Region LLC**

38.     Defendant PBF Energy Western Region LLC is a Delaware limited liability company headquartered in Parsippany, New Jersey and, upon information and belief, a wholly owned subsidiary of PBF Energy, Inc.

**Defendant Martinez Refining Company LLC ("MRC")**

39.     Defendant Martinez Refining Company LLC is a Delaware limited liability company, upon information and belief headquartered in Martinez, California. It is a wholly owned subsidiary of Defendant PBF Energy, Inc. through, upon information and belief, PBF Energy Western Region, LLC.

40.     The Refinery is Defendants' most recent acquisition.  The 157,000 barrel-per-day, dual-coking refinery is located on an 860-acre site in the City of Martinez, 30 miles northeast of San Francisco, California. The Refinery is a high-conversion facility with a Nelson Complexity Index of 16.1, making it one of the most complex refineries in the United States. The facility is strategically positioned in Northern California and provides for operating and other synergies with Defendants' Torrance refinery in Southern California.

41.    At all relevant times, each of the Defendants was the agent, servant, employee, co-conspirator, alter ego, and/or joint venture of each of the other Defendants. In doing the things herein alleged, each and every Defendant was acting within the course and scope of this agency, employment, conspiracy, alter ego, and or joint venture, and was acting with the consent, permission, and authorization of each of the other Defendants. All actions of each Defendant, as alleged in the causes of action stated herein, were ratified, approved, and/or authorized by every other Defendant with full knowledge of such acts. Defendants are thus jointly and severally liable for such actions.

## IV.    FACTUAL ALLEGATIONS

42.    The Refinery has a history of regulatory violations dating from both Defendants' ownership and their predecessor, Shell. For example, on or about May 23, 2018, Defendants' predecessors entered into a consent decree with the U.S. EPA related to multiple violations, including failure to accurately analyze worst-case release scenarios and multiple violations based upon failing to immediately give notice of hazardous releases.[12] *See* **Exhibit A**, attached.

### A.    **A Series Of Equipment Failures At The Refinery Lead To The November 24-25, 2022 Fallout**

43.    The Bay Area Air Quality Management District ("BAAQMD") investigation determined that the source of the November 2022 chemical release was what it called a "process unit upset" at MRC's fluid catalytic cracking unit ("FCCU"). This "upset" lead to the release of spent catalyst material from the FCCU and the blanketing of the region with chemical release (especially areas downwind from the Refinery).

/././

/././

/././

/././

/././

/././

---

[12] https://www.epa.gov/archive/epa/newsreleases/us-epa-requires-bay-area-refinery-improve-waste-management-pay-penalty.html.

**CLASS ACTION COMPLAINT**                                                                 13



Figure 1: White, ash-like material deposited on a car near the corner of Berrellesa and Main Streets in Martinez.

Source: *See*, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://cchealth.org/hazmat/pdf/MRC-Incident-2022-11-Methods-and-Findings-2023-0405.pdf. (last accessed June 5, 2023).

44.    In the FCCU, chemical reactions involving a catalyst material crack bonds within heavy oil feedstock processed at the Refinery. Heavy oil feedstock contains high levels of sulfur, nitrogen and metals; the concern is always the resulting atmospheric residue from the process. Once the reaction in the FCCU is complete, spent catalyst is regenerated by burning the deposited carbon (known as coke). This produces flue gas, which can still contain catalyst materials. The flue gas is sent to carbon monoxide boilers ("COBs"), which are thermal oxidizers which convert carbon monoxide ("CO") in the exhaust stream to $CO_2$ and use the gas as fuel to produce steam for the Refinery.

/././

/././

/././

/././

/././

/././



Source: https://www.sfchronicle.com/bayarea/article/martinez-refinery-white-dust-map-17893393.php

45.     Importantly, the boilers are equipped with air pollution control devices, called electrostatic precipitators ("ESP"), which use high-voltage electric shocks to remove suspended catalyst material and other particulate matter from the flue gas. The COBs have sensors that to monitor particulate matter emitted with the flue gas. As noted by the Air District's April 5, 2023 report on the incident, "**MRC electively shuts down the ESPs**" during startup and shutdown of the FCCU units.

46.     Leading up to the incident, according to MRC, there was an "upset" (*i.e.*, failure) at the Refinery on the night of Sunday November 20, 2022. MRC eventually admitted that it turned off its ESPs (air pollution devices) from approximately the early morning of Monday, November 21, 2022, until Friday November 25, 2022.

47.     Below is a sampling of Facebook postings from Defendants during the incident:

/./././

/./././

/./././

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Martinez Refining Company**
November 24, 2022 · 🌐                                    ···

We are experiencing a flaring event at the Martinez Refining Company. We apologize for impacting some of our neighbors and thank our employees who are safely responding to resolve the equipment issue that is causing intermittent flaring.   Flares are an essential part of a refinery's integrated, engineered safety systems that safely and effectively manage excess gases.   Flares are designed to safely and effectively manage excess combustible gases, by burning them off efficiently and effectively.  As always, we have a community inquiry phone number you can call 925-313-3777 or  925-313-3601 during off work hours. Thank you.

👍😠 46                                          35 comments  2 shares



**Martinez Refining Company**
November 25, 2022 · 🌐                                    ···

We have received calls from our neighbors who are reporting white dust on their cars.  A Refinery Team Leader has taken samples from various locations, and we will have them tested by a lab to identify the substance(s). If you have white dust on your vehicle, please email MRC.CommunityRelations@pbfenergy.com.  A photo(s) and an address will help us with our investigation.  Thank you for your cooperation and patience as we investigate.

👍 44                                          28 comments  18 shares

**Martinez Refining Company**
November 26, 2022 · 🌐                                    ···

On November 25, 2022, Martinez Refining Company was informed by residents that a white, ash-like substance had been found on buildings and cars, primarily in the downtown area. A refinery representative took samples of the material to a laboratory for testing.

As of 8:00 am November 26, 2022, we are awaiting the results of the sample testing to determine the type of material, which can help in identifying the source. We are checking refinery operating records, including wind direction over the past 24 hours.
We have informed Contra Costa County Health Department and the Bay Area Air Quality Management District our response team is investigating the matter.

At this time, we are unable to confirm whether this material was released from the refinery, but as soon as we receive the laboratory results, we will advise the public, officials, and agency representatives of our findings.

Based on the physical properties of the dust, one potential source is catalyst dust. At the refinery we use alumina silicate, a material mined from the earth that also contains minerals, as a catalyst in the refining process. "Spent," or used catalyst, has been incinerated to remove impurities so the catalyst can be reused again. Alumina silicate and the other natural occurring materials are considered non-toxic and non-hazardous, including in this form.

We appreciate hearing from our neighbors as we investigate this matter. If you have white dust on your vehicle, please email MRC.CommunityRelations@pbfenergy.com.  A photo(s) and an address will help us with our investigation.

Thank you for your cooperation and patience.



**Martinez Refining Company**
November 26, 2022 · 🌐                                                    ...

Thank you, neighbors, for contacting us and your patience while we investigated the white, ash-like material found on buildings and cars, primarily in the Downtown Martinez Area, on November 25, 2022.

In response, Martinez Refining Company representatives took samples of the material to a lab for testing. Although we are still waiting to get the results back from the lab, based on input from the community and refinery personnel, we believe the substance is likely catalyst dust used in the refining process. We aim to be a good, respectful neighbor, and we apologize for any inconvenience this release may have caused.

Catalyst dust is primarily alumina silicate, clay, and other minerals mined from the earth This is also known as "spent," or used catalyst, which has been incinerated at high temperatures to remove impurities so the catalyst can be reused.

Alumina silicate and the other naturally occurring materials are considered non-toxic and non-hazardous, including in this form. This material appears as minute white particles that is easily removed by rinsing with water from surfaces such as, patio furniture, toys, and fruits and vegetables. There are no health risks associated with this material.

For people who may have difficulty removing the dust from their vehicles, Martinez Refining Company has made arrangements with Autotopia Car Wash in Martinez, to provide car washes to Martinez residents in the affected area through December 2, 2022.

• Autotopia: 3950 Alhambra Avenue, Martinez
• Sunday 11/27, 9am-4:00pm
• Monday-Friday 11/28-12/2, 9am – 4:30pm
Please provide your driver's license as proof of Martinez residency.

If you experience issues removing the substance with water on other surfaces, or if you have any additional questions, please contact MRC.CommunityRelations@pbfenergy.com.

Again, thank you to those of you who shared information with us, and to everyone for your patience.

👍 83                                             64 comments  28 shares

*Screenshots from Defendant MRC's Facebook page*

48.    It appears that as MRC plant operators worked on restarting the FCCU they were unable to control pressure imbalances in the catalyst flow. A system of separators designed to collect and recycle catalyst material (*i.e.*, pollutants) were allowed to overfill, leading to catalyst discharges from the COBs. The failures at the Refinery cascaded – opacity sensors, which measure the thickness or darkness of smoke, in the COBs were maxed out due to the extreme levels of catalyst emissions. Abatement controls were in a state of total failure.

49.    According to Air District staff, MRC recorded 12 "opacity excesses" between November 24 and November 25, 2022. **MRC admits that from 20 to 24 tons of catalyst spewed into the air** those two days from two active CO boiler stacks (CO Boilers #1 and #2). Those particular stacks are massive, each rising over 142 feet in the air and with a diameter of nearly

eight feet. The amount of catalyst could be much higher than admitted by MRC for a number of reasons, including that the plant's pollution sensors wear in a state of failure.

50.    Using MRC's own estimates, the Air District published the following time graph:



Figure 3. Hourly particulate matter emission rates (in grams per second) used for air quality modeling.

51.    BAAQMD has handed the Refinery at least 21 violation notices. The incident was determined to be a **Major Chemical Accident or Release** ("MCAR") by the Contra Costa Health Hazardous Materials Program (Incident #22112601).

**B.    MRC Failed to Report the Toxic Emissions Per State and Federal Regulations; Health Officials Learned of the Event From Residents**

52.    According to the BAAQMD's Managing Director, Philip Martien, the mechanical failure on November 20, four days before the November 24-25, 2022 event, started a chain of events leading to the Thanksgiving night discharge which continued into the next day. However, MRC did not notify officials of the mechanical failure.

53.    **Instead, officials did not learn of the failure event until the next day, when residents started reporting the chemical release blanketing their community.**[13]

---

[13] *See, https://www.danvillesanramon.com/news/2023/04/13/officials-say-martinez-refinery-had-problems-worth-reporting-days-before-discharge* (last accessed June 6, 2023).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

54.     According to Martinez City Councilmember Jay Howard, MRC officials claimed that CCH had instructed MRC not to communicate with the public over the incident, but CCH engineer Nicole Heath has confirmed that CCH never gave any such instruction to Defendants.[14]

**C.     Defendants Shrugged Off the Severity of the Refinery Failure, Offering Residents Free Car Washes**

55.     According to Contra Costa County, Defendants' cover up at the time of the disaster meant that health officials were unable to sound the alarm when it would have mattered most – in the first hours of the event. The Contra Costa District Attorney's office opened a case in January 2023 on Defendants' failure to notify officials about the hazardous release of contaminants, according to Matthew Kaufmann, the county's deputy health director.[15]

56.     When community members started asking questions, Defendants responded with a November 26 Facebook post claiming that the spent catalyst was "non-toxic and non-hazardous."[16]

57.     When the public demanded answers, Defendants misleadingly claimed the material contained "alumina silicate, clay and other materials mined from the earth" – later testing would show a toxic slew of heavy metals. PBF offered free car washes to residents.

58.     Around the time of the harmful release of spent catalyst, Defendants failed to warn Plaintiffs and Class members of the toxic nature of the release. Rather, Defendants proceeded to publicly proclaim that the spent catalyst dust was non-toxic and naturally occurring.

59.     Defendants further stated to the public in their Facebook posts that alumina silicate and the other released materials are considered non-toxic and non-hazardous. They also stated that this material appeared as minute white particles, easily removed by rinsing with water from surfaces such as, patio furniture, toys, and fruits and vegetables. They claimed there are no health risks associated with the discharged material.

---

[14] *See, https://www.danvillesanramon.com/news/2023/04/13/officials-say-martinez-refinery-had-problems-worth-reporting-days-before-discharge* (last accessed June 6, 2023).

[15] https://www.mercurynews.com/2023/05/27/fbi-epa-investigating-hazardous-chemical-release-from-martinez-refinery/

[16] https://www.latimes.com/environment/story/2023-04-11/officials-release-map-of-refinerys-hazardous-fallout

60.     In response to Defendants' release of up to 24 tons of metal-laden "spent catalyst" containing heavy metals and other toxics, the County issued several advisories regarding the effects of this toxic release.

**D.     Months After The Disaster Residents Were Advised not to Eat Anything Grown in the Community**

61.     Many local residents enjoy gardening in home and community gardens. In fact, just before Thanksgiving, more than 200 hundred sixth graders from local schools planted winter seedlings, according to the nonprofit New Leaf Collaborative. The children planted vegetables, including sugar snap peas and cabbage in garden beds and barrels. As in past years, the school gardens were for community members who wished to pick fruit from the gardens' 19 trees.

62.     However, that tradition had to end this year. On March 7, 2023, over three months after the environmental disaster, the Contra Costa Health Service issued a Health Advisory recommending that residents not consume fruits or vegetables grown in soil exposed to the November 2022 incident. The produce grown by the local school children had to be destroyed instead of feeding the community.

**E.     Defendants are Repeat Environmental Offenders**

63.     Defendants are repeat offenders and notorious for flagrantly violating safety standards across their refineries. For example, in 2018, after Defendant PBF Energy's acquisition, its Torrance refinery was hit with a state penalty amounting to $150,000 for improperly storing hazardous waste and materials. In 2020, the EPA fined this same refinery for gross safety violations stemming from a 2016 investigation.

64.     In the case of the Martinez Refinery, in another incident on December 9, 2022, the Refinery experienced a larger than usual flaring event, which was unsettling to many people who live in the area. The Contra Costa county investigated this incident and noted that it was "taking these events very seriously, and we're investigating the events to the fullest of our ability to completely understand the impacts that have happened to the community and taking all the steps

1  necessary to be able to hold the refinery accountable for any regulatory statutes they've

2  violated."[17]



*December 9 flaring*
Source: https://www.nbcbayarea.com/news/local/east-bay/contra-costa-county-investigates-martinez-refinery/3108846/

65.    On July 11, 2023, the Refinery again erupted, this time spewing black petroleum coke dust into the air and over the surrounding community. Again, Defendants delayed notifying regulatory authorities, who did not learn of the toxic release until two hours later. Residents in the surrounding community awoke to a thin layer of black dust of unknown composition covering their homes and property. Investigation of this event is ongoing.

**F.    NOTICE**

66.    Defendants, the Administrator of the EPA and the State of California were on notice pursuant the Clean Air Act (42 U.S.C. § 7604 (b)(1)) of Defendants' violation of said Act, at least as early as January 29, 2023, 60 days after the City of Martinez's press release related to the November 22, 2022 incident. Over 300 days have elapsed since January 28, 2023, permitting Plaintiff to file suit under the Clean Air Act.

---

[17] Contra Costa County Investigates Incidents at Martinez Refinery – NBC Bay Area

## V.     CLASS ACTION ALLEGATIONS

67.     Plaintiffs bring this class action individually and on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1)(A), and 23(b)(3). This action may be brought and properly maintained as a class action because Plaintiffs satisfy the numerosity, adequacy, typicality, and commonality pre-requisites for suing as representative parties pursuant to Federal Rule of Civil Procedure 23(a).

68.     As detailed in the individual counts below, **Plaintiffs Alena Cruz and Shannon Payne** are members of and seek to represent the following class:

**All individuals who reside and/or work in the City of Martinez, including the surrounding communities of Alhambra Valley and Franklin Canyon, as well as El Sobrante, Hercules, Benicia, and Richmond, who have been exposed to elevated levels of "spent catalyst" discharged from the Refinery during the period November 24, 2022 to the present.**

69.     Excluded from the above Class is any entity in which Defendants have a controlling interest, and officers or directors of Defendants. Also excluded from this Class is any judge or judicial officer presiding over this matter and the members of his or her immediate family and judicial staff.

70.     Plaintiffs reserve the right under Rule 23 time and modify the proposed class depositions and to add one or subclasses based on information obtained during this litigation.

71.     This action is brought and may be properly maintained as a class action against Defendants under the following provisions of Rule 23:

72.     **Numerosity (Rule 23(a)(1)):** The members of the Class are so numerous that their individual joinder is impracticable. Martinez alone is home to over 40,000 individuals.[18]  Other surrounding cities with thousands more residents are also affected by the release of spent catalyst. This Class is likely to exceed thousands of members. The identities of Class members may be identified through the media and through verification of home and work addresses. Class members may self-identify as having a right to recover based on the class description, including, but not limited to, by reference to geographic extent and a specific time frame.

---

[18] https://www.mercurynews.com/2023/03/13/a-mysterious-white-sand-fell-on-martinez-now-residents-fear-their-soil-is-unsafe/

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

73.    **Commonality and Predominance (Rules 23(a)(2) and 23(b)(3)):** many questions of law and fact are common to the Class. These common questions predominate over any questions affecting only individual Class members. These common questions include, but are not limited to:

A.    Whether Defendants were negligent in their construction, maintenance, and operation of the Refinery;

B.    Whether Defendants owed any duties to Class Members;

C.    Whether Defendants breached one or more duties to Class Members;

D.    Whether Defendants' actions and inactions were a substantial factor in causing harm to Class Members;

E.    Whether Defendants' harmful release of spent catalyst resulted in toxic exposure to Class Members at levels warranting future medical monitoring;

F.    Whether Defendants have engaged in an ultrahazardous activity;

G.    Whether Defendants committed regulatory or statutory violations based upon their failure to timely notify the community of the discharges;

H.    Whether the Court should establish a Court-supervised administered trust fund and medical monitoring regime to compensate Plaintiffs and Class Members; and

I.    whether Plaintiffs and Class members are entitled to declaratory relief, injunctive relief, restitution, damages, or any other relief requested herein.

74.    **Typicality (Rule 23(a)(3)):** Named Plaintiffs' claims are typical of the other Class members claims because: Defendants' wrongful acts and omissions alleged herein were substantially the same with respect to Plaintiffs and all other Class members, Defendants' wrongful acts and omissions alleged herein because Plaintiffs and all other Class members comparable injury, Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and there are no defenses that are unique to any of the Plaintiff's.

75.    **Adequacy of Representation (Rule 23(a)(4)):** Plaintiffs can fairly and adequately represent and protect the interests of all other Class members. There are no material conflicts between the interest of Plaintiffs and the other Class members that would make certification of the

Class inappropriate. Plaintiffs have retained competent and qualified counsel who have extensive experience in complex litigation in class action litigation and who will vigorously prosecute the claims of Plaintiffs and all other Class members.

76.    This action is properly maintained as a class action under Rule 23(b) for the following reasons:

a.    **Class Action Status (Rule 23(b)(1)):** Class action status is appropriate under Rule 23(b)(1)(A) because prosecution of separate actions by each of the tens of thousands of Class members would create a risk of establishing incompatible standards of conduct for Defendants and inconsistent results for Class members. Class action status is also appropriate under Rule 23(b)(1)(B) because prosecution of separate actions by Class members would create a risk of adjudication with respect to individual Class members that, as a practical matter, would be dispositive of other Class members' interests or would substantially impair or impede their ability to protect their interests.

b.    **Declaratory and Injunctive Relief (Rule 23(b)(2)):** Certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds that apply generally to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

c.    **Predominance and Superiority (Rule 23(b)(3)):** Certification under Rule 23(b)(3) is appropriate because questions of law and fact common to the Class predominate over the questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy, including consideration of the following: (i) the relatively limited interests of Class members in individually controlling the prosecution of separate actions; (ii) the limited extent and nature of any litigation concerning this controversy already begun by Class members; (iii) the desirability of concentrating the litigation of the claims in this forum; and (iv) the relatively minor difficulties likely to arise in managing the proposed class action. Class action treatment is superior here because the monetary harms suffered by individual Class members are small compared to the burden and expense of bringing and prosecuting individual actions against Defendants to address their complex

misconduct against the community. A class action allows for the adjudication of a significant number of claims that would otherwise go unaddressed because of the significant practical difficulties and relative expense of bringing and maintaining an individual action, and also provides economies of scale and other significant potential benefits that can be realized only by resolving this controversy in a single adjudication with comprehensive supervision by a single court. By contrast, individualized litigation also presents a potential for inconsistent or contradictory judgments, would increase the delay and expense to all parties and the court system due to the complex legal and factual issues involved in this controversy, and would make it virtually impossible for individual Class members to redress effectively the harm done to them by Defendants.

d.     **Issue Certification (Rule 23(c)(4)):** Certification of particular issues in this action, including issues of liability and relief sought, is appropriate under Rule 23(c)(4) because these issues are common to all Class members, and because resolution of these common issues on a classwide basis will materially advance the disposition of the litigation as a whole.

e.     The Class is ascertainable from Plaintiffs and Class members verifiable residential and work addresses, and there is a well-defined community of interest in the questions of law and fact alleged herein since the rights of each Class member were infringed or violated by Defendants in the same or similar fashion.

## VI.     TOLLING OF THE STATUTES OF LIMITATIONS

77.     To the extent that there are any statutes of limitations applicable to Plaintiffs' and Class members' claims, the running of the limitations periods have been tolled by various doctrines and rules, including but not limited to equitable tolling, the discovery rule, the fraudulent concealment rule, equitable estoppel, the repair rule, and class action tolling.

/./ /

/./ /

/./ /

/./ /

/./ /

VII.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of the Clean Air Act**

**42 U.S.C. § 7401 et. seq.**

**(On Behalf of the Class Against All Defendants)**

78.     Plaintiffs and Class Members incorporate and re-allege each of the paragraphs above as though fully set forth herein.

79.     The Clean Air Act ("CAA"), 42 U.S.C. § 7401 et. Seq., sets out a comprehensive regulatory scheme designed to prevent and control air pollution. The Act establishes ambient air quality standards and permit requirements for both stationary and mobile sources. Congress passed the Clean Air Act in order to prevent air pollution and to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare. U.S.C. §7401.42 (b) (1). The CAA directs Environmental Protection Agency to designate areas with ambient air national quality standards ("NAAQS"), "the attainment and maintenance of which ... are requisite to protect the public health" with "an adequate margin of safety." 42 U.S.C.A. § 7409 (a) and (b).

80.     The CAA is implemented jointly by the United States Environmental Protection Agency (EPA) and the states. The CAA requires each state to adopt and submit to EPA for approval a State Implementation Plan (SIP). 42 U.S.C.A. § 7410.  SIPs provide the mechanism for states to ensure compliance with national air quality standards. 42 U.S.C.A. § 7410 (A)(2)(a), §7502 (c) (6).

81.     The EPA has approved elements of California's SIP, including the Fluidized Catalytic Cracking Unit (FCCU) Emission Limits at issue in this case. 40 C.F.R. § 52.220 (79) (ii).

82.     There are 35 local Air Pollution Control Districts (APCD) and Air Quality Management Districts (AQMD) ("Districts") charged with the primary responsibility for controlling air pollution from stationary sources. Specifically, the AQMD is charged with controlling air pollution from stationary sources in all or portions of the nine Bay Area counties,

including Contra Costa County, under the CAA.  The Districts' responsibility includes adopting and enforcing rules and regulations relating to air pollution and maintaining healthy air quality.[19]

83.     The CAA authorizes any person to commence a civil action on her own behalf against any person "who is alleged to have violated (if there is evidence that alleged violation has been repeated) or to be in violation of.. an emission standard or limitation ...."  42 U.S.C.A. § 7410(a)(1). The terms "emission limitation" and "emission standard" mean a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter. 42 U.S.C.A. § 7602(k).

84.     The AQMD promulgates Rule 6-5-301, Fluidized Catalytic Cracking Unit (FCCU) Emission Limits which states that the owner/operator of a refinery that includes an FCCU shall not cause emissions to the atmosphere from the FCCU that exceed the prescribed limits of Ammonia and Sulfer Dioxide. This Rule was federally approved by the EPA as part of California's SIP on or about June 02, 1980. 40 C.F.R. § 52.220 (79) (ii).

85.     Defendants by their actions have caused emissions to the atmosphere from the FCCU that exceed the standards set by California in violation of Rule 6-5-301.

86.     By committing the violations of Rule 6-5-301, Defendants have violated the Clean Air Act 42 U.S.C.§7604 (a) by violating an "emission standard or limitation" as defined by 42 U.S.C. §7604 (f) (1), (3), and (4).

87.     As a result of Defendant's impermissible violations, Plaintiffs' and class members have been, and continue to be, exposed to harmful air pollution that will increase the likelihood of health risks including cancer. The Refinery's pollution would have been controlled or curtailed if Defendant had complied with the CAA.

88.     Each day that Defendants fails to comply with Rule 6-5-301 is a separate violation of the Act. Each day that Defendant operated the Refinery without complying

---

[19] California Air Resource Board, *Air District Rules*, https://ww2.arb.ca.gov/air-district-rules, see also *Current Air District Rules*, https://ww2.arb.ca.gov/current-air-district-rules.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

with Rule 209-B is a separate violation of the Act. Each violation and each day

of violation constitutes a separate violation subject to penalties, injunctive and declaratory relief.

### SECOND CLAIM FOR RELIEF

**Request For Medical Monitoring -  Contamination**

**(On Behalf of the Class Against All Defendants)**

89.    Plaintiffs and Class Members incorporate and re-allege each of the paragraphs

above as though fully set forth herein.

90.    Defendants have exposed Plaintiffs to excessive levels of spent catalyst, chemicals,

and toxins, and other environmental conditions proven hazardous to human health. Studies have

proven that exposure to high levels of aluminum can result in several symptoms such as confusion,

memory loss, and long-term cognitive impairment. Furthermore, the likelihood of suffering

respiratory, cardiovascular, and neurological disorders as a result of this harmful release exposes

Plaintiffs to severe discomfort, annoyance, anxiety, fear, worries, and stress; all of which can

impact Plaintiffs' and Class member's mental health and wellbeing.

91.    The exposure to these dangerous substances and conditions is such that Plaintiffs

have been placed at an increased risk of contracting latent illness and disease, including but not

limited to respiratory, cardiovascular, neurological, and mental health issues, and as such, require

medical monitoring which Defendants are responsible for providing and paying for Monitoring

and testing procedures for respiratory, cardiovascular, and neurological disorders and other

illnesses associated with exposure to spent catalyst and its underlying toxins, as well as for mental

health issues, which make the early detection and treatment of such diseases and health conditions

possible and beneficial.

92.    Monitoring and testing procedures for respiratory and cardiovascular disorders,

neurological disorders, and other illnesses associated with exposure to spent catalyst and its

underlying toxins exist, as well as for mental health issues, which make the early detection and

treatment of such diseases and health conditions possible and beneficial.

93.    Accordingly, the Court should establish a Court-supervised and administered trust

fund and medical monitoring regime to compensate Plaintiffs and Class Members.

**THIRD CLAIM FOR RELIEF**

**Request For Environmental Monitoring**

**(On Behalf of the Class Against All Defendants)**

94.     Plaintiffs and Class Members incorporate and re-allege each of the paragraphs above as though fully set forth herein.

95.     Defendants have released excessive levels of spent catalyst, chemicals, and toxins, and other environmental conditions proven hazardous to human health into the environment.

96.     The risk of Defendants repeatedly releasing more of these hazardous chemicals into the environment is such that environmental monitoring is required for which Defendants are responsible for providing and paying.

97.     Monitoring and testing procedures to prevent Defendants from releasing more hazardous chemicals into the environment is necessary and appropriate to prevent further harms.

98.     Accordingly, the Court should establish a Court-supervised and administered trust fund and environmental monitoring regime to prevent Defendants from further contaminating the environment.

**FOURTH CLAIM FOR RELIEF**

**Strict Liability for Ultrahazardous Activities**

**(On Behalf of the Class Against All Defendants)**

99.     Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

100.     At all times herein, the Defendants were the owners and operators of the Refinery.

101.     At all times relevant to this action, the Defendants had supervision, custody, and control of the Refinery. The Refinery is within close proximity to several residential communities in Martinez, Benicia, and Richmond, and is a densely populated area with thousands of residents.

102.     Defendants were and continue to be engaged in an ultrahazardous activity by producing, handling, transporting, housing, and distributing products that contain hazardous chemicals, including but not limited to aluminum, barium, chromium, nickel, vanadium, and zinc at the Refinery.

103.    Petroleum refining involves risks of serious harm, including exposing residents to harmful chemicals, which cannot be mitigated by the exercise of due care.

104.    Nearby residents face a high degree of risk of serious harm to their person due to potential exposure to chemicals from the Refinery. Petroleum refining is not a matter of common usage, and is not carried on by the great mass of mankind. Petroleum refining is neither commonplace nor customary.

105.    Industrial facilities such as MRC are required by state law and county policy to immediately report the release or suspected release of hazardous materials to emergency response authorities, including the county's Community Warning System, which sends text and telephone messages with emergency instructions to affected parts of the county.

106.    It is very likely that the harm resulting from a hazardous release in a high consequence area near a major population center would be hazardous because airborne toxic gases or powders can travel quickly and great distances, making total containment impossible. The risk in such a setting cannot be eliminated by the exercise of reasonable care.

107.    Petroleum refining adjacent to a major population center is completely inappropriate and inherently dangerous. Any value to the community of the processes involved in petroleum refining is far outweighed by the inherent danger of such an activity to the surrounding populace.

108.    It was not merely the sensitive geographic area that elevated the hazardousness of the Defendants' activities, but also the Defendants' numerous failures to follow the notification procedure and to maintain pollution control and warning equipment in operational condition at all times. As a result, Defendants' ultrahazardous activities did exactly what should have been expected—caused substantial harm to the Plaintiffs and the Class members.

109.    Defendants' operation of the Refinery was a substantial factor in causing the harms suffered by Plaintiffs and the Class.

110.    The harm to Plaintiffs and the Class was and is the kind of harm that would be reasonably anticipated as a result of the risks created by Defendants engaging in the process of petroleum refining near a large population center.

111. As a direct and legal result of the wrongful acts and/or omissions of Defendants and each of them, Plaintiffs have suffered damages, including but not limited to exposure to harmful and hazardous substances such as spent catalyst which can result in the future development of disease, including cancers, in the exposed population. Those diseases can be mitigated through medical monitoring to provide early diagnosis and treatment.

112. As a direct and legal result of the wrongful acts and/or omissions of Defendants and each of them, Plaintiffs have incurred, and will continue to incur, medical and incidental expenses for such examination, treatment, rehabilitation, and care, and the cost of medical monitoring, all in an amount according to proof.

113. Plaintiffs and the Class are entitled to compensatory damages, including but not limited to general damages for pain, suffering, fear, worry, annoyance, discomfort, disturbance, inconvenience, mental anguish, and emotional distress.

114. In failing to take protective measures to safeguard against the danger, the officers, directors and/or managing agents of Defendants acted with a willful and/or knowing disregard of the probable dangerous consequences, and/or acted with an awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences, thereby creating a substantial risk of injury to Plaintiffs and the surrounding community.

115. Plaintiffs and the Class are also entitled to punitive and exemplary damages in an amount to be ascertained, which is appropriate to punish or set an example of Defendants and deter such behavior by Defendants and others in the future.

### **FIFTH CLAIM FOR RELIEF**

**Negligence**

**(On Behalf of the Class Against All Defendants)**

116. Plaintiffs and Class Members incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

117. At all relevant times, Defendants and each of them, owned, operated, inspected, controlled, managed, and/or maintained the Refinery.

118.    At all relevant times prior to this incident, Defendants and each of them, had the duty to exercise the utmost care and diligence in the ownership, design, operation, management, supervision, inspection, maintenance, repair, and/or control of the Refinery in compliance with relevant regulations and industry standards, so as not to cause harm to individual persons.

119.    At all relevant times, Defendants and each of them, negligently, carelessly, recklessly, and/or unlawfully used, owned, operated, managed, supervised, maintained, repaired, and/or controlled the Refinery, including but not limited to failing to properly store products containing highly hazardous and toxic chemicals and metallic substances.

120.    Defendants and each of them, also knew, or should have known, that failure to maintain, inspect, and/or repair the Refinery facilities would reasonably increase the probability of a catastrophic event, such as an uncontrollable harmful release of spent catalyst, which foreseeably would lead to injuries to the health and safety of Plaintiffs and their community, generally. Further, per the several health advisories issued in this regard, the roughly 20 tons of spent catalyst released into the air can easily enter food streams through harvest, thus endangering the lives of community members within the affected geographical area and even beyond.

121.    Further, Defendants and each of them, knew, or should have known, that failure to have established plans, processes, and/or protocols to address such an event and the subsequent clean up would reasonably increase the probability of a sustained catastrophic event, which foreseeably would lead to and/or increase injuries to the health and safety of Plaintiffs and their community, generally.

122.    In failing to take protective measures to safeguard against the danger, Defendants and each of them, created a substantial risk of injury to Plaintiffs and the community of residents living near the Refinery and within the larger affected geographical area, generally.

123.    As a direct and legal result of the wrongful acts and/or omissions of Defendants and each of them, Plaintiffs have suffered damages, including but not limited to exposure to harmful and hazardous substances such as spent catalyst which can result in the future development of disease, including cancers, in the exposed population. Those diseases can be mitigated through medical monitoring to provide early diagnosis and treatment.

124.   As a direct and legal result of the wrongful acts and/or omissions of Defendants and each of them, Plaintiffs have incurred, and will continue to incur, medical and incidental expenses for such examination, treatment, rehabilitation, and care, and the cost of medical monitoring, all in an amount according to proof.

125.   Plaintiffs and the Class are entitled to compensatory damages, including but not limited to general damages for pain, suffering, fear, worry, annoyance, discomfort, disturbance, inconvenience, mental anguish, and emotional distress.

126.   In failing to take protective measures to safeguard against the danger, the officers, directors and/or managing agents of Defendants acted with a willful and/or knowing disregard of the probable dangerous consequences, and/or acted with an awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences, thereby creating a substantial risk of injury to Plaintiffs and the surrounding community.

127.   Plaintiffs are entitled to punitive and exemplary damages in an amount to be ascertained which is appropriate to punish or set an example of Defendants and deter such behavior by Defendants and others in the future.

## SIXTH CLAIM FOR RELIEF

### Public and Private Nuisance

### (On Behalf of the Class Against All Defendants)

128.   Plaintiffs and Class Members incorporate and re-allege each of the paragraphs above as though fully set forth herein.

129.   Defendants have created and continue to create a public nuisance in violation of California Civil Code §§ 3479 and 3480.

130.   Defendants, through their acts and failures to act, have created a condition and allowed a condition to exist that harms the health of residents and workers in the community, including Plaintiffs and Class Members. Defendants' operations have exposed Plaintiffs and Class Members to excessive levels of spent catalyst, chemicals and toxins, and other environmental conditions proven hazardous to human health.

131.    Defendants, through their acts and failures to act, have also created a condition or allowed a condition to exist that has obstructed free use of property, so as to interfere with its comfortable enjoyment. When Plaintiffs woke to find property covered with ash and soot from Defendants' operations, they were alarmed and concerned that they had been exposed to toxic substances that were not only noxious but could increase the risk of cancer. Their concerns have only been confirmed by subsequent testing by the County which established that Defendants' discharges are contaminated with heavy metals. This interference is both significant and unreasonable.

132.    Defendants' toxic emissions have affected a substantial number of people at the same time.

133.    Ordinary people are reasonably disturbed by exposure to cancer-causing emissions.

134.    Plaintiffs and Class Members are suffering harm that is greater and significantly different from the type suffered by the general public. Defendants' toxic emissions are localized and do not affect all Bay Area residents equally. Moreover, those living within 1 mile of the Refinery are affected the most.

135.    The seriousness of Defendants' toxic emissions and the harm suffered by Plaintiffs and Class Members outweigh the social utility of Defendants' conduct.

136.    At no point have Plaintiffs or Class Members consented to Defendants' harmful conduct.

137.    Defendants' conduct is a substantial factor in causing Plaintiffs and Class Members special harm in direct relation to proximity to the Refinery.

138.    Defendants owed and continues to owe a duty to Plaintiffs and the putative Class to take reasonable steps to prevent and/or abate the interference with common public rights and/or the invasion of the private interests of Plaintiffs.

139.    Plaintiffs therefore seek a judicial declaration that Defendants have been and continue to be a public nuisance, in violation of California Civil Code §§ 3479 and 3480.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class Members request relief against Defendants as follows:

1.    For judgment in favor of Plaintiffs and Class Members on all claims;

2.    For injunctive relief prohibiting Defendants from continuing the wrongful conduct alleged herein and establishing an independent oversight board including community members and experts who will have access to all data on airborne or ground measurements or predictions of toxics released from the Refinery, so that it is possible to obtain an independent evaluation of the level of risk and exposure from the Refinery's repeated toxic releases;

3.    For declaratory relief against Defendant as specified herein;

4.    For compensatory and general damages according to proof;

5.    For past and future medical expenses, including medical monitoring expenses, and incidental expenses according to proof;

6.    For general damages for fear, worry, annoyance, discomfort, disturbance, inconvenience, mental anguish, emotional distress, and loss of quiet enjoyment of property;

7.    For an award to Plaintiffs and Class Members for punitive and exemplary damages according to proof;

8.    An award of reasonable attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5 and any other applicable law;

9.    Pre- and post-judgment interest at the maximum rate provided by law; and

10.    Such other and further relief as the Court may deem proper.


Dated: November 28, 2023            **COTCHETT, PITRE & McCARTHY, LLP**


                                    By: _____

                                    ANNE MARIE MURPHY
                                    JOSEPH W. COTCHETT
                                    BLAIR V. KITTLE
                                    VASTI S. MONTIEL
                                    *Attorneys for Plaintiffs*

1

## IX.    DEMAND FOR JURY TRIAL

2            Plaintiffs hereby demand trial by jury on all issues so triable.

3

4    Dated: November 28, 2023            **COTCHETT, PITRE & McCARTHY, LLP**

5

6                                        By:    _____

7                                        BLAIR V. KITTLE
                                         VASTI S. MONTIEL
8                                        *Attorneys for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION IX
75 Hawthorne Street
San Francisco, CA  94105

MAY 23 2018

Certified Mail No.
Return Receipt Requested

Marcelo Ognian, Manager
Health, Safety, Security and Environmental
Shell Oil Products US
PO Box 711
Martinez, California 94553

> **RE:     Consent Agreement and Final Order**
> **In the Matter of Shell Martinez Refinery**

Dear Mr. Ognian:

Please find enclosed a copy of the final executed Consent Agreement and Final Order (CA/FO) negotiated between the United States Environmental Protection Agency, Region IX (EPA) and Shell Oil Products US (Shell).

This CA/FO sets out the terms for resolution of the Clean Air Act section 112(r), Comprehensive Environmental Response, Compensation and Liability Act, Emergency Planning and Community Right-to-Know Act, Resource Conservation and Recovery Act and Clean Water Act section 311 violations discovered during routine compliance evaluation inspections at your refinery in Martinez, California.

Shell's full compliance with the terms of this CA/FO will close this case. If you have any questions regarding the regulations governing your operations or the rules which govern the proceedings terminated by the enclosed document, please have your counsel contact Rebekah Reynolds, in the Office of Regional Counsel, at (415) 972-3916.

Sincerely,

Kathleen Johnson, Director
Enforcement Division

_tov_ Enrique Manzanilla, Director
Superfund Division

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGION IX

```
** FILED **
23MAY2018 - 09:50AM
U.S.EPA - Region 09
```

| In the matter of: | ) | U.S. EPA Docket Nos. |
|---|---|---|
| | ) | |
| | ) | |
| Shell Martinez Refinery | ) | |
| 3485 Pacheco Boulevard | ) | MM-09-2018-0001 |
| Martinez, California | ) | OPA-09-2018-0003 |
| | ) | |
| | ) | |
| Shell Oil Products US | ) | CONSENT AGREEMENT AND |
| | ) | FINAL ORDER PURSUANT TO |
| | ) | 40 C.F.R. SECTIONS 22.13 AND |
| Respondent. | ) | 22.18 |

## **CONSENT AGREEMENT**

### A.  **PRELIMINARY STATEMENT**

1.      This is a civil administrative enforcement action instituted pursuant to Section 113(d) of the Clean Air Act ("CAA"), as amended, 42 U.S.C. § 7413(d), Section 109 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9609, Section 325 of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11045, Section 3008(a)(1) of the Resource Conservation and Recovery Act ("RCRA"), as amended, 42 U.S.C. § 6928(a)(1), Section 311(b)(6)(B) of the Clean Water Act ("CWA"), as amended, 33 U.S.C. § 1321(b)(6)(B), and the Consolidated Rules of Practice Governing the Administrative Assessment of Civil Penalties and the Revocation/Termination or Suspension of Permits, as codified at 40 Code of Federal Regulations (C.F.R.) Part 22 ("Consolidated Rules").

2.      Complainant is the United States Environmental Protection Agency, Region IX ("EPA").

3.      Respondent is Shell Oil Products U.S., a corporation doing business in the state of California ("Respondent").

4.      This Consent Agreement and Final Order ("CA/FO"), pursuant to 40 C.F.R. §§ 22.13 and 22.18, simultaneously commences and concludes this proceeding, wherein EPA alleges that Respondent violated the following statutes and their implementing regulations: Section 112(r) of the CAA, 42 U.S.C. § 7412(r), Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), Section 304 of EPCRA, 42 U.S.C. § 11004, Section 3008 of RCRA, 42 U.S.C. § 6928, and Section 311 of the CWA, 42 U.S.C. § 1321.

5.      The Parties agree that settling this action without the filing of a complaint or the adjudication of any issue of fact or law is in their respective interest and in the public interest.

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

## B.    STATUTORY AND REGULATORY FRAMEWORK

### i.    Section 112(r) of the CAA

6.      Pursuant to Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7), and its implementing
regulations, owners and operators of stationary sources at which a regulated substance is present
in more than a threshold quantity ("TQ") must prepare and implement a risk management plan
("RMP") to detect and prevent or minimize accidental releases of such substances from the
stationary source, and to provide a prompt emergency response to any such releases in order to
protect human health and the environment.

### ii.    Section 103 of CERCLA

7.      Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), and 40 C.F.R. § 302.6 require any
person in charge of a vessel or an offshore or onshore facility to immediately notify the National
Response Center ("NRC") as soon as he or she has knowledge of a release of a hazardous
substance that exceeds the reportable quantity ("RQ") during a 24-hour period.

### iii.   Section 304 of EPCRA

8.      Section 304(a) of EPCRA, 42 U.S.C. § 11004(a)(1), and 40 C.F.R. § 355.40, require the
owner or operator of a facility that produces, uses, or stores hazardous chemicals to immediately
notify the appropriate state and local emergency planning and response agencies when (a) an
extremely hazardous substance is released from the facility and (b) the release requires a
CERCLA 103(a), 42 U.S.C. § 9603(a) notification. The owner or operator must immediately
provide the required notice to the community emergency coordinator for the local emergency
planning committee ("LEPC") for any area affected by the release and to the designated state
emergency response commission ("SERC") for any state that is affected by the release.

### iv.   Subtitle C of RCRA

9.      Subtitle C of RCRA requires the EPA Administrator to promulgate regulations
establishing a hazardous waste management program. Section 3006 of RCRA, 42 U.S.C. § 6926,
provides, *inter alia*, that authorized state hazardous waste management programs are carried out
under Subtitle C of RCRA.

10.     The State of California ("State") received authorization to administer the hazardous waste
management program in lieu of the federal program pursuant to Section 3006 of RCRA, 42
U.S.C. § 6926, and 40 C.F.R. Part 271, on August 1, 1992.  The authorized hazardous waste
program is established pursuant to the Hazardous Waste Control Law, Chapter 6.5 of Division 20

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

of the California Health and Safety Code, and the regulations promulgated thereunder at Title 22, Division 4.5 of the California Code of Regulations, 22 C.C.R. §§ 66001 *et seq.* The State of California has been authorized for all the hazardous waste management regulations referenced in this CA/FO.

11.    A violation of California's authorized hazardous waste program, found at Health & Safety Code § 25100 *et seq.*, constitutes a violation of Subtitle C of RCRA and, therefore, a person who violates California's authorized hazardous waste program is subject to the powers vested in the EPA Administrator by Section 3008 of RCRA, 42 U.S.C. § 6928.

**v.  Section 311 of CWA**

12.    Section 311(j)(1)(C) of the CWA, 33 U.S.C. § 1321(j)(1)(C), provides that the President shall issue regulations "establishing procedures, methods, and equipment and other requirements for equipment to prevent discharges of oil . . . from onshore facilities . . . and to contain such discharges . . . ."

13.    Initially by Executive Order 11548 (July 20, 1970), 35 Fed. Reg. 11677 (July 22, 1970), and most recently by Section 2(b)(1) of Executive Order 12777 (October 18, 1991), 56 Fed. Reg. 54757 (October 22, 1991), the President delegated to EPA his Section 311(j)(1)(C) of the CWA, 33 U.S.C. § 1321(j)(1)(C), authority to issue the regulations referenced in the preceding Paragraph for non-transportation-related onshore facilities.

14.    EPA subsequently promulgated regulations, codified at 40 C.F.R. Part 112 (the "Oil Pollution Prevention regulations"), pursuant to these delegated statutory authorities and pursuant to its authorities under the CWA, 33 U.S.C. §§ 1251 *et seq.*, which set forth certain procedures, methods and requirements, including requirements for Spill Prevention, Countermeasure and Control ("SPCC") planning, applicable to an owner or operator of an onshore facility, which, due to its location, reasonably could be expected to discharge oil into or on navigable waters and their adjoining shorelines in such quantities as EPA has determined in 40 C.F.R. Part 110 may be harmful to the public health or welfare or the environment of the United States.

15.    "Navigable waters" are defined in Section 502(7) of the CWA, 33 U.S.C. § 1362(7) and 40 C.F.R. § 112.2 (2008).

16.    In promulgating 40 C.F.R. § 110.3, which implements Section 311(b)(4) of the CWA, 33 U.S.C. § 1321(b)(4), EPA has determined that the quantities of oil that may be harmful to the public health or welfare or the environment of the United States include discharges of oil that cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines, or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines.

3

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

## C.    EPA's GENERAL ALLEGATIONS

17.    Respondent owns and operates the Shell Martinez Refinery located at 3485 Pacheco Boulevard in Martinez, California (the "Facility"). The Facility processes about 165,000 barrels of crude oil per day and also makes asphalt, diesel, jet turbine fuel, petroleum coke, propane, residential fuel oils (for ships and industrial boilers), and sulfur.

18.    On November 17-20, 2014, EPA performed an inspection pursuant to Section 112(r) of the CAA, 42 U.S.C. § 7412(r), Sections 304-312 of EPCRA, 42 U.S.C. §§ 11004-12, and Section 103 of CERCLA, 42 U.S.C. § 9603(a). On March 23-27 and 30, 2015, EPA performed an inspection pursuant to Subtitle C of RCRA. On November 15, 2016, EPA performed an inspection pursuant to Section 311 of the CWA, 42 U.S.C. § 1321. Based upon the information gathered during these inspections and subsequent investigations, EPA determined that Respondent violated certain provisions of the CAA, CERCLA, EPCRA, RCRA and the CWA.

### i.    Section 112(r) of the CAA

19.    Respondent is subject to the powers vested in the EPA Administrator by Section 113 of the CAA, 42 U.S.C. § 7413.

20.    Section 113 of the CAA, 42 U.S.C. § 7413, authorizes EPA to assess civil penalties for any violation of Section 112(r) of the CAA, 42 U.S.C. § 7412(r).

21.    The Administrator of EPA delegated the authority to sign consent agreements memorializing settlements of enforcement actions under the CAA to Regional Administrators with EPA delegation 7-6-A, dated August 4, 1994. The Regional Administrator, EPA Region IX, in turn, redelegated this authority with respect to enforcement of Section 112(r) of the CAA, 42 U.S.C. § 7412(r), to the Director of the Superfund Division, as well as the Director of the Enforcement Division, Region IX, with delegation R9 1265.05A, dated February 11, 2013.

22.    In a letter dated December 9, 2016, the United States Department of Justice granted EPA a waiver to allow EPA to pursue certain administrative actions for violations of 40 C.F.R. Part 68, promulgated pursuant to Section 112(r) of the CAA, 42 U.S.C. § 7412(r).

23.    At all times relevant to this CA/FO, Respondent is a "person" as defined by Section 302(e) of the CAA, 42 U.S.C. § 7602(e).

24.    The Facility is a "stationary source" as defined by Sections 111(a)(3) and 112(a)(3) of the CAA, 42 U.S.C. §§ 7411(a)(3) and 7412(a)(3).

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

25.     At all times, relevant to this CA/FO, Respondent has been the "owner or operator" of the Facility as defined by Sections 111(a)(5) and 112(a)(9) of the CAA, 42 U.S.C. §§ 7411(a)(5) and 7412(a)(9).

26.     Pursuant to Section 112(r) of the CAA, 42 U.S.C. § 7412(r), EPA established a TQ for each "regulated substance" above which a facility shall be subject to the requirements of Section 112(r) of the CAA, 42 U.S.C. § 7412(r). For substances designated as "regulated toxic substances" or "regulated flammable substances," the TQs are specified at 40 C.F.R. § 68.130, Table 3.

27.     Butane is a "regulated flammable substance" listed under Section 112(r)(3) of the CAA, 42 U.S.C. § 7412(r)(3), with a TQ of 10,000 pounds. 40 C.F.R. § 68.130, Table 3.

28.     At all times, relevant to this CA/FO, Respondent has 10,000 pounds or more of butane in one or more processes at its Facility.

ii.   **Section 103 of CERCLA**

29.     Section 109 of CERCLA, 42 U.S.C. § 9609, authorizes EPA to assess civil penalties for any violation of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

30.     The Administrator of EPA delegated enforcement authority under Section 109 of CERCLA, 42 U.S.C. § 9609, to the Regional Administrators with EPA delegation 14-31, dated May 11, 1994. The Regional Administrator, EPA Region IX, in turn, redelegated that authority to the Director of the Superfund Division, Region IX, with delegation R9 1290.16.

31.     At all times relevant to this CA/FO, Respondent has been a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

32.     The Facility is an "onshore facility" as defined by Sections 101(18) and 101(9) of CERCLA, 42 U.S.C. §§ 9601(18) and 9601(9).

33.     At all times relevant to this CA/FO, Respondent has been the "owner or operator" of the Facility as defined by Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

34.     Sulfuric acid is designated as a "hazardous substance" in Sections 101(14) and 102(a) of CERCLA, 42 U.S.C. §§ 9601(14) and 9602(a), and 40 C.F.R. § 302.4, Table 302.4 and Appendix A to Section 302.4. The RQ for sulfuric acid is 1000 pounds.

35.     At all times relevant to this CA/FO, Respondent has had 1000 pounds or more of sulfuric acid in one or more processes at its Facility.

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

### iii. **Section 304 of EPCRA**

36.     Section 325 of EPCRA, 42 U.S.C. § 11045, authorizes EPA to assess civil penalties for any violation of Section 304 of EPCRA, 42 U.S.C. § 11004.

37.     The Administrator of EPA delegated enforcement authority under EPCRA to the Regional Administrators with EPA delegation 22-3-A, dated May 11, 1994. The Regional Administrator, EPA Region IX, in turn, redelegated that authority to enforce, *inter alia,* Section 304 of EPCRA, 42 U.S.C. § 11004, to the Director of the Superfund Division, Region IX, with delegation R9 1290.18.

38.     At all times relevant to this CA/FO, Respondent has been a "person" as defined by Section 329(7) of EPCRA, 42 U.S.C. § 11049(7).

39.     The Facility is a "facility" as defined by Section 329(4) of EPCRA, 42 U.S.C. § 11049(4).

40.     Sulfuric acid is designated as an "extremely hazardous substance" in Section 302(a) of EPCRA, 42 U.S.C. § 11002(a), and 40 C.F.R. § 355, Appendices A and B. The RQ for sulfuric acid is 1000 pounds.

41.     Sulfuric acid is a "hazardous chemical" as defined by Sections 329(5) and 311(e) of EPCRA, 42 U.S.C. §§ 11049(5) and 11021(e).

42.     At all times relevant to this CA/FO, the California Governor's Office of Emergency Service ("Cal OES") has been the SERC.

43.     At all times relevant to this CA/FO, Respondent "produced, used, or stored" sulfuric acid at the Facility within the meaning of Section 304 of EPCRA, 42 U.S.C. § 11004.

### iv. **Subtitle C of RCRA**

44.     Section 3008 of RCRA, 42 U.S.C. § 6928, authorizes the EPA Administrator to issue orders assessing a civil penalty and/or requiring compliance immediately or within a specified time for violation of any requirement of Subtitle C of RCRA, Section 3001 of RCRA *et seq*., 42 U.S.C. § 6921 *et seq*.

45.     The Administrator has delegated enforcement authority under Section 3008 of RCRA, 42 U.S.C. § 6928, to the EPA Regional Administrators, with delegation 8-9-A, last revised February 4, 2016. The Regional Administrator, EPA Region IX, in turn, redelegated that authority to the

6

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

Director of the Enforcement Division, Region IX, with delegation R9-120 TN 111, dated January 22, 2016.

46.     Respondent is a "person" as defined in 22 C.C.R. § 66260.10 [*see also* 40 C.F.R. § 260.10].[1]

47.     Respondent is the "operator" of a facility as defined in 22 C.C.R. § 66260.10 [see also 40 C.F.R. § 260.10].

48.     Respondent is a "generator" of hazardous waste as defined in 22 C.C.R. § 66260.10 [40 C.F.R. § 260.10].

49.     Respondent is or has been engaged in "treatment," "storage," or "disposal" of hazardous waste as defined in 22 C.C.R. § 66260.10 [*see also* 40 C.F.R. § 260.10].

50.     Respondent generates and accumulates, or has generated and accumulated, materials that are "wastes" as defined in 22 C.C.R. §§ 66260.10 and 66261.2 [*see also* 40 C.F.R. § 261].

51.     At the Facility, Respondent generates and accumulates, or has generated and accumulated, "hazardous waste" as defined in California Health & Safety Code § 25117, and 22 C.C.R. §§ 66260.10 and 66261.3 [*see also* RCRA § 1004(5), and 40 C.F.R. §§ 260.10 and 261.3].  These hazardous wastes include but are not limited to paint waste (D001 and D035), laboratory waste, including silver nitrate (D011), spent chloroform (D022), spent acetone/xylene (F003), spent toluene (F005), petroleum refinery primary oil/water/solids separation sludge (F037), petroleum refinery secondary oil/water/solids separation sludge (F038), heat exchanger bundle cleaning sludge (K050), and API separator sludge (K051).

   **iv.  Section 311 of the CWA**

52.     Section 311(b)(6)(B) of the CWA, 33 U.S.C. § 1321(b)(6)(B), authorizes the EPA to assess civil penalties for any violation of Section 311(j) of the CWA, 33 U.S.C. § 1321(j).

53.     The Administrator has delegated enforcement authority under Section 311(b)(6)(B) of the CWA, 33 U.S.C. § 1321(b)(6)(B), to the EPA Regional Administrators, with delegation 2-51, dated May 11, 1994. The Regional Administrator, EPA Region IX, in turn, redelegated that authority to the Director of the Enforcement Division, Region IX, with delegation R9-2-51, dated February 11, 2013.

---

[1] All citations to the "C.C.R." refer to Division 4.5 of Title 22 of the current California Code of Regulations.  EPA is enforcing California hazardous waste management program requirements as approved and authorized by the United States.  As a convenience, corresponding Federal citations are provided in brackets.

7

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

54.    At all times relevant to this CA/FO, Respondent has been the "owner or operator" within the meaning of Section 311(a)(6) of the CWA, 33 U.S.C. § 1321(a)(6), of the Facility.

55.    Respondent is a "person" within the meaning of Sections 311(a)(7) and 502(5) of the CWA, 33 U.S.C. §§ 1321(a)(7) and 1362(5), and 40 C.F.R. § 112.2.

56.    The Facility is "non-transportation-related" within the meaning of 40 C.F.R. § 112.2.

57.    The Facility is an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10), and 40 C.F.R. § 112.2.

58.    At all times relevant to this CA/FO, Respondent was engaged in the production of oil and oil products.

59.    At all times relevant to this CA/FO, the Facility had several above-ground oil storage tanks and process vessels with a combined oil storage capacity of greater than 400,000,000 gallons.

60.    The Facility is in close proximity to "navigable waters" of the United States within the meaning of Section 502(7) of the CWA, 42 U.S.C. § 1362(7), and 40 C.F.R. § 112.2 (2008); specifically, the Facility is located in Martinez, adjacent to the Carquinez Strait, which flows into the San Pablo Bay, which flows into the Pacific Ocean.

61.    Due to its location, the Facility could reasonably be expected to discharge oil from an above-ground container to a navigable water of the United States or its adjoining shorelines in a harmful quantity, and is therefore subject to the Oil Pollution Prevention regulations at 40 C.F.R. Part 112. Because of its size and proximity to sensitive environments and drinking water intakes, the Facility is also subject to the facility response planning requirements at 40 C.F.R. § 112.20.

D.    **EPA's ALLEGED VIOLATIONS**

**COUNT IA**
**(failure to accurately analyze and report in its RMP a worst-case release scenario)**

62.    Paragraphs 1 through 61 above are incorporated herein by this reference as if they were set forth here in their entirety.

63.    40 C.F.R. § 68.25 requires that an owner or operator shall analyze and report in the RMP

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

one worst-case release scenario that is estimated to create the greatest distance in any direction to an endpoint resulting from an accidental release of regulated flammable substances from covered processes under worst-case conditions.

64.     At the time of Respondent's June 18, 2014 RMP submission, a release of butane from a different tank than what was reported, could result in a greater distance to endpoint.

65.     By failing to accurately analyze and report in its RMP the worst-case release scenario that is estimated to create the greatest distance in any direction to an endpoint resulting from an accidental release of a regulated flammable substance, Respondent violated Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7), and 40 C.F.R. § 68.25.

## COUNT IB
### (failure to compile accurate piping and instrument diagrams ("P&IDs"))

66.     Paragraphs 1 through 61 above are incorporated herein by this reference as if they were set forth here in their entirety.

67.     Respondent failed to update P&ID 584752, revision 41, to show that a drain line had been removed and that there were valves around the pressure gauges.

68.     By failing to update and ensure that all of its process P&IDs accurately reflected the design of a covered process as installed in the field, Respondent violated Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7), and 40 C.F.R. § 68.65(d)(1)(ii).

## COUNT II
### (failure to immediately notify the NRC of a release of an RQ of sulfuric acid)

69.     Paragraphs 1 through 61 above are incorporated herein by this reference as if they were set forth here in their entirety.

70.     On December 14, 2013, the Facility released 4,605 pounds of sulfuric acid. Respondent's operator discovered the release at 7:30 a.m. Respondent failed to notify the NRC until 11:24 a.m.

71.     By failing to immediately notify the NRC, Respondent violated Section 103 of CERCLA, 42 U.S.C. § 9603.

## COUNT III
### (failure to immediately notify the SERC of a release of an RQ of sulfuric acid)

72.     Paragraphs 1 through 61 above are incorporated herein by this reference as if they were

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

set forth here in their entirety.

73.    On December 14, 2013, the Facility released 4,605 pounds of sulfuric acid. Respondent's operator discovered the release at 7:30 a.m. Respondent failed to notify Cal OES, the SERC, until 11:24 a.m.

74.    By failing to immediately notify the SERC, Respondent violated Section 304 of EPCRA, 42 U.S.C. § 11004.

**COUNT IV**
**(failure to make a hazardous waste determination)**

75.    Paragraphs 1 through 61 above are incorporated herein by this reference as if they were set forth here in their entirety.

76.    22 C.C.R. § 66262.11 states that a person who generates a solid waste, as defined by 22 C.C.R. § 66261.2, must make an accurate determination as to whether that waste is a hazardous waste. [*see also* 40 C.F.R. § 262.11].

77.    During the inspection, EPA observed eighteen containers of waste in the paint shop at the Facility being managed as nonhazardous waste. Respondent subsequently determined that the containers contained D001 and/or D035 hazardous waste.

78.    Based on evidence gathered during its investigation, EPA determined that Respondent discharged stormwater from its process areas into the surface impoundments throughout the Facility. Respondent had not sampled the stormwater before discharging it into the surface impoundments.

79.    Therefore, EPA alleges that Respondent failed to determine if all solid waste generated at the Facility was hazardous, a violation of 22 C.C.R. § 66262.11 [*see also* 40 C.F.R. § 262.11].

**COUNT V**
**(failure to obtain a permit for storage, treatment and disposal of hazardous waste)**

80.    Paragraphs 1 through 61 above are incorporated herein by this reference as if they were set forth here in their entirety.

81.    22 C.C.R. § 66270.1(c) requires that each person owning or operating a facility where hazardous waste is treated, stored, or disposed have a permit [*see also* 40 C.F.R. § 270.1(c)].

82.    At the time of the inspection, Respondent did not have a permit or grant of interim status

10

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

to store, treat, or dispose of hazardous waste under 22 C.C.R. § 66270.1(c) [*see also* 40 C.F.R. '
270.1(c)].

83.     Based on information gathered during the inspection, EPA alleges that Respondent
stored and treated D011, D022, F003 and F005 hazardous wastes generated in the Quality
Assurance Laboratory and Crack Product Field Laboratory.

84.     Based on information gathered during the inspection, EPA alleges that
K050 hazardous waste was released from Respondent's heat exchanger bundle cleaning pad.

85.     Based on information gathered during the inspection, EPA determined that Respondent
stored, treated and disposed of D001 and D035 hazardous waste in its paint shop.

86.     Therefore, EPA alleges that Respondent treated, stored and disposed of hazardous waste
without a permit, a violation of 22 C.C.R. § 66270.1 [*see also* 40 C.F.R. § 270.1].

## COUNT VI
### (Failure to maintain and operate the Facility
### to minimize the possibility of an unplanned release)

87.     Paragraphs 1 through 61 above are incorporated herein by this reference as if they were
set forth here in their entirety.

88.     22 C.C.R. §§ 66262.34(a)(4) and 66265.31 provide that facilities must be
maintained and operated to minimize the possibility of a fire, explosion, or any unplanned
sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or
surface water which could threaten human health or the environment [*see also* 40 C.F.R. §§
262.34(a) and 265.31].

89.     During the inspection, EPA observed a thin layer of fly ash (K048 and D010 hazardous
waste) on the wooden structure beneath the baghouse near the carbon monoxide boiler unit.

90.     Therefore, EPA alleges that Respondent failed to operate the Facility to minimize the
possibility of a release of hazardous waste, a violation of 22 C.C.R. §§ 66262.34(a)(4) and
66265.31 [*see also* 40 C.F.R. §§ 262.34(a) and 265.31].

## Count VII
### (failure to comply with satellite accumulation requirements)

91.     Paragraphs 1 through 61 above are incorporated herein by this reference as if they were

11

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

set forth here in their entirety.

92.     Pursuant to 22 C.C.R. § 66262.34(e)(1), a generator may accumulate as much as 55 gallons of hazardous waste in containers "at or near any point of generation" so long as certain conditions are met [*see also* 40 C.F.R. § 262.34(c)(1)].

93.     Pursuant to 22 C.C.R. § 66262.34(e)(3), once the 55-gallon limit is reached, the generator has only three days before the waste must be moved to a central storage area and all relevant pre-transport requirements apply [*see also* 40 C.F.R. § 262.34(c)(2)].

94.     Based on information gathered during the inspection, EPA determined that Respondent exceeded the three-day pre-transport accumulation time requirement for two 55-gallon paint solvent wastes in its paint shop.

95.     Therefore, EPA alleges that Respondent has violated 22 C.C.R. § 66262.34(e)(3) [*see also* 40 C.F.R. § 262.34(c)].

## <u>Count VIII</u>
### (failure to comply with container management requirements)

96.     Paragraphs 1 through 61 above are incorporated herein by this reference as if they were set forth here in their entirety.

97.     22 C.C.R. § 66262.34(f) requires that containers storing hazardous waste be marked with the date upon which the period of accumulation begins, the words hazardous waste, information about the composition and physical state of the wastes, a statement or statements which call attention to the particular hazardous properties of the waste (e.g., flammable, reactive, etc.), and the name and address of the person producing the waste [*see also* 40 C.F.R. 262.34(a)(2)-(3)].

98.     22 C.C.R. § 66265.173 requires that "[a] container holding hazardous waste shall always be closed during transfer and storage, except when it is necessary to add or remove waste." [*see also* 40 C.F.R. § 265.173].

99.     During the inspection, EPA inspectors observed that containers in and just outside the Quality Assurance Laboratory that contained F003, F005, D011, and D022 hazardous waste were unlabeled. EPA's inspectors also observed open containers of F003 and F005 hazardous waste under the laboratory hood in the Quality Assurance Laboratory.

100.     Therefore, EPA alleges that Respondent failed to comply with container management

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

requirements for hazardous waste generators in violation of 22 C.C.R. §§ 66262.34(a)(1)(A), 66262.34(a)(2), (3), and 66265.173 [*see also* 40 C.F.R. §§ 262.34(a)(2), 262.34(a)(3), and 265.173].

## Count IX
### (improper use of a 6400-gallon mobile refueler tank)

101.    Paragraphs 1 through 61 above are incorporated herein by this reference as if they were set forth here in their entirety.

102.    SPCC requirements for facilities include requirements to: (1) maintain adequate containment or diversionary structures to prevent a discharge, 40 C.F.R. § 112.7(c); (2) keep written procedures and a record of the inspections and tests, 40 C.F.R. § 112.7(e); (3) not use a container for the storage of oil unless its material and construction are compatible with the material stored and conditions of storage such as pressure and temperature, 40 C.F.R. § 112.8(c)(1); (4) test or inspect on a regular schedule in accordance with appropriate industry standard, 40 C.F.R. § 112. 8(c)(6); and (5) promptly correct visible discharges which result in a loss of oil, 40 C.F.R. § 112.8(c)(10).

103.    During the inspection, EPA observed a 6400-gallon mobile refueler in use as a stationary fuel storage and dispensing tank that did not meet all of the SPCC requirements.

104.    Respondent's use of the 6400-gallon mobile refueler at the Facility that did not meet all SPCC requirements is a violation of 40 C.F.R. §§ 112.7 and 112.8.

## Count X
### (inadequate Federal Response Plan ("FRP"))

105.    Paragraphs 1 through 61 above are incorporated herein by this reference as if they were set forth here in their entirety.

106.    40 C.F.R. § 112.20(h) requires that an FRP either follow a model format or be granted a waiver by the Regional Administrator to deviate from the model format. 40 C.F.R. § 112.20(h)(5) requires that an FRP include a discussion of specific planning scenarios for, among other things, a Worst Case Discharge ("WCD"), as calculated using the appropriate worksheet in Appendix D to the regulations. Part A of Appendix D sets forth a worksheet to calculate the WCD for an onshore storage facility. For multiple-tank facilities that have adequate secondary containment, the worksheet requires that the facility "[c]alculate the capacity of the largest single aboveground oil storage tank within an adequate secondary containment area or the combined capacity of a group of above-ground oil storage tanks permanently manifolded together, whichever is greater."

13

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

107.    Respondent has not been granted a waiver by the Regional Administrator to deviate from the model format.

108.    The largest tank at SMR is tank TK-17596, which has a shell capacity of 14,700,000 gallons.

109.    At the time of the inspection, Respondent mistakenly reported a WCD of 320,460 gallons in its FRP.

110.    Respondent's failure to utilize the correct volume of the largest aboveground storage container at the Facility for determining the WCD volume is a violation of 40 C.F.R. § 112.20(h).

**E.    CIVIL PENALTY**

111.    The Complainant proposes that Respondent be assessed, and Respondent agrees to pay ONE HUNDRED FORTY-TWO THOUSAND SIX HUNDRED SIXTY-FOUR DOLLARS ($142,664), as the civil penalty for the violations alleged herein. $97,575 resolves Counts I-VIII, and $45,089 resolves Counts IX and X.

112.    The proposed penalty was calculated in accordance with the "Combined Enforcement Policy for Clean Air Act Sections 112(r)(1), 112(r)(7), and 40 C.F.R. Part 68" dated June 2012, the "Enforcement Response Policy for Sections 304, 311, and 312 of the Emergency Planning and Community Right-to-Know Act and Section 103 of the Comprehensive Environmental Response, Compensation and Liability Act" dated September 30, 1999, the "June 2003 RCRA Civil Penalty Policy," and  the "Civil Penalty Policy for Section 311(b)(3) and Section 311(j) of the Clean Water Act" dated August 1998, and was adjusted for inflation by the Federal Civil Penalties Inflation Adjustment Act, as amended, and the Civil Monetary Penalty Inflation Adjustment Rule, 40 C.F.R. Part 19.

**F.    ADMISSIONS AND WAIVERS OF RIGHTS**

113.    For the purposes of this proceeding, Respondent admits and agrees that EPA has jurisdiction and authority over the subject matter of the action commenced in this CA/FO and over Respondent. Respondent consents to and agrees not to contest EPA's jurisdiction and authority to enter into and issue this CA/FO and to enforce its terms.  Further, Respondent will not contest EPA's jurisdiction and authority to compel compliance with this CA/FO in any enforcement proceedings, either administrative or judicial, or to impose sanctions for violations of this CA/FO.

14

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

114.    Respondent neither admits nor denies any allegations of fact or law set forth in Section D of this CA/FO and does not admit any liability arising out of the occurrences alleged in this CA/FO. Respondent hereby waives any rights Respondent may have to contest the allegations set forth in this CA/FO, waives any rights Respondent may have to a hearing on any issue relating to the factual allegations or legal conclusions set forth in this CA/FO, including without limitation a hearing, and hereby consents to the issuance of this CA/FO without adjudication. In addition, Respondent hereby waives any rights Respondent may have to appeal the Final Order attached to this Consent Agreement and made part of this CA/FO.

## G.    **PARTIES BOUND**

115.    This CA/FO shall apply to and be binding upon Respondent and its agents, successors and assigns, until the civil penalty required under Sections E and I has been paid in accordance with Section I, the compliance tasks required under Section H have been completed in accordance with Section H, the SEP required under Section J has been completed in accordance with Section J, and any delays in performance and/or stipulated penalties have been resolved. When those matters are concluded, this CA/FO shall terminate and constitute full settlement of the violations alleged herein.

116.    No change in ownership or corporate, partnership or legal status relating to the Facility will in any way alter Respondent's obligations and responsibilities under this CA/FO.

117.    The undersigned representative of Respondent hereby certifies that he or she is fully authorized by Respondent to enter into this CA/FO, to execute and to legally bind Respondent to it.

## H.    **COMPLIANCE TASKS**

118.    All submissions to EPA in this section shall be to Sharon Lin at EPA at lin.sharon@epa.gov.

### **Surface Impoundment Sampling and Reporting**

119.    <u>Sampling Protocol.</u> Within thirty (30) days of the Effective Date, Respondent shall submit a sampling protocol for Upper Lake Slobodnik and Pond 6 at the Wastewater Treatment Plant to EPA for approval.

120.    <u>Sampling.</u> Upon approval of the sampling protocol, Respondent shall analyze the samples using the toxicity characteristic leaching procedure ("TCLP") for benzene and associated compounds (ethylbenzene, toluene, xylenes) using EPA Methods 1311/8260 for Upper Lake Slobodnik and for TCLP benzene and associated compounds (ethylbenzene, toluene, xylenes) using EPA Methods 1311/8260 and total suspended solids ("TSS") for Pond 6.  Respondent shall

15

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

take the samples at the inlet to the two unlined surface impoundments, Upper Lake Slobodnik and Pond 6 at the Wastewater Treatment Plant, a minimum of five times over the course of two wet weather seasons. Respondent shall use best efforts to obtain at least two of the samples for each surface impoundment during the first rain after a dry period of at least thirty (30) days.

121.    <u>Reporting</u>. Within forty-five (45) days of each sampling event, Respondent shall submit a report of the sampling results, including a summary, chain of custody, quality assurance/quality control, and photographs of the sampling activity, to EPA.

122.    <u>Final Report</u>. Within sixty (60) days of the final sampling event, Respondent shall submit a final report summarizing the results of the sampling, to EPA.

### Characterizing Spent or Recyclable Materials/Waste in the Laboratories

123.    Within thirty (30) days of the Effective Date, Respondent shall submit a report of all spent or recyclable materials/waste generated from laboratory activities to EPA. The report shall include the name of the generated spent or recyclable material/waste, analytical method used to generate the spent or recyclable material/waste, the percent hydrocarbon of the spent or recyclable material/waste, and the disposition of the spent or recyclable material (i.e., recoverable oil or hazardous waste).

124.    Respondent shall review and, where appropriate update, all method test instructions ("MTIs") used in its laboratories. Within six (6) months of the Effective Date, Respondent shall review and update those MTIs for which disposition of waste is expected to alter and submit a certification that this review and update has been completed to EPA. The remainder of MTIs shall be reviewed in the course of their normal renewal cycle.

125.    Prior to implementing any change to a test or adding a new test in its laboratories, Respondent shall review its MTI to ensure that the final disposition of the new stream generated is appropriate.

### Heat Exchanger Bundle Cleaning Pad ("Pad")

126.    <u>Upgrading Pad</u>. Within three (3) months of the Effective Date, Respondent shall evaluate the integrity of the Pad (including sumps and trenches), and identify upgrades to the Pad to ensure that all material placed on the Pad is managed appropriately. The upgrades shall include, but are not limited to, repairing damaged concrete, applying a concrete sealer over the entire surface of the Pad, and installing more curbing or berms around the perimeter of the Pad. Respondent shall submit the scope of work for the upgrade of the Pad that was identified, above, to EPA for review prior to commencing the upgrade. Respondent shall implement the scope of work to upgrade the Pad. Respondent shall submit certification that this task is complete to EPA within nine (9) months of the Effective Date.

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

127.    Updating the operating procedures for the Pad. Within three (3) months of the Effective Date, Respondent shall submit to EPA updated operating procedures (GMP-2 Bundle Pad Access) to include the following procedures: (1) ensuring that all material placed on the Pad is legitimately recycled; (2) inspecting the Pad by maintenance personnel/contractors prior to use to ensure that Pad is not in a condition that could lead to releases; (3) cleaning of Pad after each use to ensure that materials are removed from the Pad; (4) ensuring that material does not exit the Pad (e.g., from tires/boots); (5) ensuring the materials are removed from the sumps/trenches after each use; (6) conducting quarterly inspections and maintenance by appropriately trained personnel, as described in further detail in Paragraph 128, below; and (7) documenting cleaning of the Pad and transfer of materials from Pad, including sumps/trenches, in the Facility's operating record.

128.    Inspection and maintenance of the Pad. Within thirty (30) days of the Effective Date, Respondent shall begin quarterly inspections and maintenance of the of the Pad to ensure that all material is managed appropriately. Such inspection and maintenance shall include: (1) inspection for conditions that could lead to a release from the Pad including, but not limited to, inspections for cracked concrete or sealant, areas of damaged concrete around the rails, cracks, gaps or spaces on the perimeter wall of the Pad; and (2) as-needed preventative maintenance, including repairing any deterioration and re-sealing of the Pad. The results of the quarterly inspection and corrective actions taken shall be documented in the Facility's operating record and maintained for five years.

## I.    PAYMENT OF CIVIL PENALTY

129.    Respondent consents to the assessment of and agrees to pay a civil penalty of ONE HUNDRED FORTY-TWO THOUSAND SIX HUNDRED SIXTY-FOUR DOLLARS ($142,664) in full settlement of the federal civil penalty claims set forth in this CA/FO.

130.    Respondent shall submit payment of the ONE HUNDRED FORTY-TWO THOUSAND SIX HUNDRED SIXTY-FOUR DOLLARS ($142,664) within thirty (30) calendar days of the Effective Date of this CA/FO, in accordance with one of the options set forth below. The Effective Date of this CA/FO is the date the Final Order, signed by the Regional Judicial Officer, is filed with the Regional Hearing Clerk. All payments shall indicate the name of the Facility, the Respondent's name and address, and the EPA docket number of this action.

Regular Mail:
Payment shall be made by certified or cashier's check payable to "Treasurer, United States of America," and sent as follows:
U.S. Environmental Protection Agency
Fines and Penalties
Cincinnati Finance Center

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

PO Box 979077
St. Louis, MO 63197-9000

Overnight Mail:
Payment shall be made by certified or cashier's check payable to "Treasurer, United States of America," and sent as follows:
U.S. Environmental Protection Agency
Government Lockbox 979077
1005 Convention Plaza
Mail Station SL-MO-C2GL
St. Louis, MO 63101
Contact: Craig Steffen (513) 487-2091

Wire Transfers:
Wire transfers must be sent directly to the Federal Reserve Bank in New York City with the following information:
Federal Reserve Bank of New York
ABA = 021030004
Account = 68010727
SWIFT address = FRNYUS33
33 Liberty Street
New York, NY 10045
Beneficiary: US Environmental Protection Agency
*Note: Foreign banks **must** use a United States Bank to send a wire transfer to the US EPA.

ACH (also known as REX or remittance express):
US Treasury REX/Cashlink ACH Receiver
ABA: 051036706
Account Number: 310006, Environmental Protection Agency
CTX Format Transaction Code 22 – checking
Physical location of US Treasury Facility:
5700 Rivertech Court
Riverdale, MD 20737
Remittance Express (REX): 1-866-234-5681

On Line Payment:
Payers can use their credit or debit cards (Visa, MasterCard, American Express & Discover) as well as checking account information to make payments.

This payment option can be accessed from the information below:
www.pay.gov

18

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

Enter "sfo1.1" in the search field
Open form and complete required fields

**If clarification regarding a particular method of payment remittance is needed, contact the EPA Cincinnati Finance Center at 513-487-2091.**

131.   At the time payment is made, a copy of the check shall be sent to:

Regional Hearing Clerk
Office of Regional Counsel (ORC-1)
U.S. Environmental Protection Agency - Region 9
75 Hawthorne Street
San Francisco, CA 94105

With an electronic copy to:

Sharon Lin (ENF-2-2)
Enforcement Division
U.S. Environmental Protection Agency - Region 9
Lin.Sharon@epa.gov

Janice Witul (ENF-3-2)
Enforcement Division
U.S. Environmental Protection Agency - Region 9
Witul.Janice@epa.gov

Pete Reich (ENF-3-2)
Enforcement Division
U.S. Environmental Protection Agency - Region 9
Reich.Peter@epa.gov

Donald Nixon (SFD-9-3)
Superfund Division
U.S. Environmental Protection Agency - Region 9
Nixon.Donald@epa.gov

And

Rebekah Reynolds (ORC-3-2)
Office of Regional Counsel
U.S. Environmental Protection Agency – Region 9
Reynolds.Rebekah@epa.gov

19

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

132.    In accordance with the Debt Collection Act of 1982 and U.S. Treasury directive (TFRM 6-8000), each payment must be received by the due date set forth in this CA/FO to avoid additional charges. If payment is not received by the due date, interest will accrue from the Effective Date of this CA/FO at the current rate published by the United States Treasury as described at 40 C.F.R. § 13.11. In addition, a 6% per annum penalty assessed monthly will further apply on any principal amount not paid within ninety (90) calendar days of its due date. Respondent further will be liable for stipulated penalties as set forth below for any payment not received by its due date.

133.    The penalties specified in this CA/FO shall represent civil penalties assessed by EPA and shall not be deducted by Respondent or any other person or entity for federal, state, or local taxation purposes.

## J.    SUPPLEMENTAL ENVIRONMENTAL PROJECT

134.    As a condition of settlement, Respondent shall perform the specified supplemental environmental projects ("SEP") to enhance the emergency response capabilities of the Contra Costa County Health Services Hazardous Materials Program ("Hazardous Materials Program"). Performance of the tasks detailed in this Section shall constitute satisfactory performance of the SEP, which the parties agree are intended to provide significant environmental and/or public health protection and improvements.

135.    The Hazardous Materials Programs provides, among other things, incident response services to Contra Costa County. In developing this SEP, Respondent contacted the Hazardous Materials Program and inquired whether it could utilize emergency planning and preparedness assistance to better plan for and respond to spills or releases. In response to this inquiry, the Hazardous Materials Program requested that Respondent purchase certain equipment to improve the Hazardous Materials Program's ability to provide response services by identifying and monitoring chemicals and other hazardous materials in the field, and be appropriately outfitted, which will be needed for emergency planning and preparedness.

136.    Within one hundred twenty (120) days of the Effective Date of this CA/FO:

        a.    Respondent shall purchase: (i) two (2) TSI DustTrak DRX Aerosol Monitor Handheld 8534 for TWENTY-TWO THOUSAND DOLLARS ($22,000); (ii) three (3) backup batteries-Part Number: 801681 for SIX HUNDRED SEVENTY-FIVE DOLLARS ($675); (c) three (iii) battery charges-Part Number 801686 for NINE HUNDRED SIXTY DOLLARS ($960); (iv) sulphur dioxide gaskets for the C-Kit-Indian Springs numbers: AEGS, AC13A, BEGS, BC14A, CEGS, CC96 for FOUR HUNDRED FOUR HUNDRED NINETY-ONE DOLLARS ($4,491); and

20

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

     b.   Respondent shall purchase as much personal protective equipment ("PPE") for incident response as can be purchased for TEN THOUSAND DOLLARS ($10,000), and shall make delivery of the PPE to the Hazardous Materials Program. The particular model and size of the PPE will be as agreed upon by both Respondent and the Hazardous Materials Program.

Upon receipt of the equipment described above, Respondent shall make delivery of the equipment to the Hazardous Materials Program.

137.    Respondent shall use all reasonable efforts to provide equipment to the Hazardous Materials Program as described above, but may substitute equipment that supports emergency planning and preparedness that is similar in total cost to the equipment described above with the consent of the Hazardous Materials Program. Any substitution changing the total amount spent is subject to Section K.

138.    Respondent shall expend at least THIRTY-EIGHT THOUSAND ONE HUNDRED TWENTY-SIX DOLLARS ($38,126) to complete the SEPs described herein.

139.    Within one hundred fifty (150) days of the Effective Date of this CA/FO, Respondent shall submit a SEP Completion Report to EPA. The SEP Completion Report shall contain the following information: (i) a detailed description of the SEP as implemented with an accounting showing the amount Respondent expended for the implementation of the SEP and substantiating documentation, including but not limited to (i) invoices, purchase orders, checks or receipts, and correspondence with the Hazardous Materials Program; (ii) a brief, narrative description of the environmental and public health benefits resulting from implementation of the SEP; and (iii) certification that the project has been fully implemented pursuant to the provisions of the CA/FO, as described in further detail below.

140.    In the SEP Completion Report, Respondent shall, by one of its officers, sign and certify under penalty of law that the information contained in such document or report is true, accurate, and not misleading by signing the following statement: "I certify under penalty of law that I have examined and am familiar with the information submitted in this document and am familiar with the information submitted in this document and all attachments and that, based on my inquiry of those individuals immediately responsible for obtaining the information, I believe that the information is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment." The Final SEP Completion Report shall be submitted via hard copy or electronic mail to:

    Donald Nixon (SFD-9-3)
    Superfund Division
    U.S. Environmental Protection Agency - Region 9
    75 Hawthorne Street
    San Francisco, CA 94105

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

Nixon.Donald@epa.gov

141.    Failure to complete the SEP Completion Report required herein shall be deemed a violation of this CA/FO and Respondent shall be liable for stipulated penalties pursuant to Section K.

142.    With regard to the SEP, Respondent, by signing this CA/FO, certifies the truth and accuracy of each of the following: (i) that all cost information provided to EPA in connection with EPA's approval of the SEP is complete and accurate and that Respondent in good faith estimates that the cost to implement the SEP is at least THIRTY-EIGHT THOUSAND ONE HUNDRED TWENTY-SIX DOLLARS ($38,126); (ii) that, as of the date of this Agreement, Respondent is not required to perform or develop the SEP by any federal, state, or local law or regulation and is not required to perform or develop the SEP by agreement, grant, or as injunctive relief awarded in any other action in any forum; (iii) that the SEP is not a project that Respondent was planning or intending to construct, perform or implement other than in settlement of the claims resolved in this Agreement; (iv) that Respondent has not received and will not receive credit for the SEP in any other enforcement action; (v) that Respondent will not receive reimbursement for any portion of the SEP from another person or entity; (vi) that for federal income tax purposes, Respondent will neither capitalize into inventory or basis nor deduct any costs or expenditures incurred in performing the SEP; and (vii) that Respondent is not a party to any federal financial transaction that is funding or could fund the same activity as the SEP described in this Agreement and has inquired of the Hazardous Materials Program whether it is a party to an open federal financial assistance transaction that is funding or could fund the same activity as the SEP and has been informed by the Hazardous Materials Program that to its knowledge it is not a party to such a transaction.

143.    Any public statement, oral or written, in print, film, or other media, made by Respondent making reference to the SEP under this CA/FO from the date of Respondent's execution of this CA/FO shall include the following language: "This project was undertaken in connection with the settlement of an enforcement action taken by the Environmental Protection Agency to enforce federal laws."

## K.    DELAY IN PERFORMANCE/STIPULATED PENALTIES

144.    In the event Respondent fails to meet any requirement set forth in this CA/FO, Respondent shall pay stipulated penalties as follows: FIVE HUNDRED DOLLARS ($500) per day for first to fifteenth day of delay, ONE THOUSAND DOLLARS ($1,000) per day for sixteenth to thirtieth day of delay, and ONE THOUSAND FIVE HUNDRED DOLLARS ($1,500) per day for each day of delay thereafter. Compliance by Respondent shall include

22

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

completion of any activity under this CA/FO in a manner acceptable to EPA and within the specified time schedules in and approved under this CA/FO.

145.    In the event that Respondent fails to substantially conduct the SEP in accordance with the terms of this CA/FO, Respondent shall pay a stipulated penalty of FIFTY-SEVEN THOUSAND ONE HUNDRED EIGHT-NINE ($57,189) less any stipulated penalties already paid for failure to submit the SEP Completion Report pursuant to Paragraph 149.

146.    If Respondent demonstrates that the SEP tasks described in Section J were completed, but Respondent incurs less than 90 percent of the costs required to be incurred pursuant to Section J, Respondent shall pay a stipulated penalty to the United States that is the difference between THIRTY-EIGHT THOUSAND ONE HUNDRED TWENTY-SIX DOLLARS ($38,126) and the actual costs incurred by Respondent toward completion of the tasks described in Section J.

147.    If Respondent fails to demonstrate that the SEP tasks in Section J were completed, but EPA determines that the Respondent: (i) made good faith and timely efforts to complete these tasks; and (ii) certifies, with supporting documentation, that at least 90 percent of the costs that were required to be incurred pursuant to Section J were incurred for the SEP tasks described in Section J, Respondent shall not be liable for any stipulated penalty under Section K.

148.    For failure to submit the SEP Completion Report required by Section J, Respondent shall pay a stipulated penalty in the amount of FIVE HUNDRED DOLLARS ($500) for each day after the date the SEP Completion Report was due until it is submitted. Stipulated penalties for failure to submit the SEP Completion Report shall begin to accrue on the day after the report is due, and shall continue to accrue through the final day of EPA's receipt of this document. Notwithstanding the penalty amounts described in this paragraph, the total stipulated penalty paid by Respondent pursuant to this paragraph shall not exceed FIFTY-SEVEN THOUSAND ONE HUNDRED EIGHT-NINE ($57,189).

149.    All penalties owed to EPA under this Section shall be due within thirty (30) days of receipt of a notification of noncompliance. Such notification shall describe the noncompliance and shall indicate the amount of penalties due. Interest at the current rate published by the United States Treasury, as described at 40 C.F.R. §13.11, shall begin to accrue on the unpaid balance at the end of the thirty-day period.

150.    All penalties shall be remitted in the same manner described in Section I.

151.    The payment of stipulated penalties shall not alter in any way Respondent's obligation to complete the performance required hereunder.

152.    Notwithstanding any other provision of this Section, EPA may, in its unreviewable

23

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

discretion, waive any portion of stipulated penalties that have accrued pursuant to this CA/FO.

153.    The stipulated penalties set forth in this Section do not preclude EPA from pursuing any other remedies or sanctions that may be available to EPA because of Respondent's failure to comply with any of the requirements of this CA/FO.

154.    The payment of stipulated penalties specified in the Section shall not be deducted by Respondent or any other person or entity for federal, state or local taxation purposes.

## L.    **CERTIFICATION OF COMPLIANCE**

155.    In executing this CA/FO, subject to the provisions of Section H above, Respondent certifies under penalty of law to EPA that it has fully complied with the following statutes and their implementing regulations that formed the basis for the violations alleged in Section D, above: Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7), Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), Section 304 of EPCRA, 42 U.S.C. § 11004, Section 3008 of RCRA, 42 U.S.C. § 6928, and Section 311 of CWA, 42 U.S.C. § 1321.

156.    This certification of compliance is based upon true, accurate, and complete information, which the signatory can verify personally or regarding which the signatory has inquired of the person or persons directly responsible for gathering the information.

## M.    **RESERVATION OF RIGHTS**

157.    Except as addressed in this CA/FO, EPA hereby reserves all of its statutory and regulatory powers, authorities, rights and remedies, both legal and equitable, including the right to require that Respondent perform tasks in addition to those required by this CA/FO. EPA further reserves all of its statutory and regulatory powers, authorities, rights and remedies, both legal and equitable, which may pertain to Respondent's failure to comply with any of the requirements of this CA/FO, including without limitation, the assessment of penalties under Section 113 of the CAA, 42 U.S.C. § 7413, Section 109 of CERCLA, 42 U.S.C. § 9609, Section 325 of EPCRA, 42 U.S.C. § 11045, Section 3008 of RCRA, 42 U.S.C. § 6928 and Section 311(b) of the CWA, 33 U.S.C. § 1321(b). This CA/FO shall not be construed as a covenant not to sue, release, waiver or limitation of any rights, remedies, powers or authorities, civil or criminal, which EPA has under CAA, CERCLA, EPCRA, RCRA, CWA, or any other statutory, regulatory or common law enforcement authority of the United States.

158.    Compliance by Respondent with the terms of this CA/FO shall not relieve Respondent of its obligations to comply with the CAA, CERCLA, EPCRA, RCRA, the CWA or any other applicable local, State or federal laws and regulations.

159.    The entry of this CA/FO and Respondent's consent to comply shall not limit or

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

otherwise preclude EPA from taking additional enforcement actions should EPA determine that such actions are warranted except as they relate to Respondent=s liability for federal civil penalties for the alleged violations and facts as set forth in Section D of this CA/FO.

160.    This CA/FO is not intended to be nor shall it be construed as a permit. This CA/FO does not relieve Respondent of any obligation to obtain and comply with any local, State or federal permits.

## N.    OTHER CLAIMS

161.    Nothing in this CA/FO shall constitute or be construed as a release from any other claim, cause of action or demand in law or equity by or against any person, firm, partnership, entity or corporation for any liability it may have arising out of or relating in any way to the generation, storage, treatment, handling, transportation, release, or disposal of any hazardous constituents, hazardous substances, hazardous wastes, pollutants, or contaminants found at, taken to, or taken from the Facility.

## O.    MISCELLANEOUS

162.    This CA/FO may be amended or modified only by written agreement executed by both EPA and Respondent.

163.    The headings in this CA/FO are for convenience of reference only and shall not affect interpretation of this CA/FO.

164.    Each party to this action shall bear its own costs and attorneys' fees.

165.    EPA and Respondent consent to entry of this CA/FO without further notice.

## P.    EFFECTIVE DATE

166.    In accordance with 40 C.F.R. §§ 22.18(b)(3) and 22.31(b), this CA/FO shall be effective on the date that the Final Order contained in this CA/FO, having been approved and issued by the Regional Judicial Officer, is filed with the Regional Hearing Clerk.

IT IS SO AGREED.

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

FOR RESPONDENT SHELL OIL PRODUCTS US:

4/26/2018
Date

Marcelo Ognian, Manager
Health, Safety, Security and Environmental

FOR COMPLAINANT U.S. ENVIRONMENTAL PROTECTION AGENCY, REGION 9:

5/14/18
Date

Enrique Manzanilla, Director
Superfund Division

5/15/18
Date

Kathleen Johnson, Director
Enforcement Division

26

In the Matter of Shell Martinez Refinery
Shell Oil Products US
Consent Agreement and Final Order

## FINAL ORDER

IT IS HEREBY ORDERED that this Consent Agreement and Final Order pursuant to 40
C.F.R. Sections 22.13 and 22.18 (U.S. EPA Docket Nos. OPA-09-2018-0003, and MM-09-2018-
0001) be entered and that Respondent pay a civil penalty of ONE HUNDRED FORTY-TWO
THOUSAND SIX HUNDRED SIXTY-FOUR DOLLARS ($142,664), due within thirty (30)
days from the Effective Date of this Consent Agreement and Final Order, implement the
compliance tasks described in Section H, and implement the Supplemental Environmental
Project described in Section J of this CA/FO, in accordance with all terms and conditions of this
Consent Agreement and Final Order.

This Final Order shall be effective upon filing by the Regional Hearing Clerk.


05/23/18

Date


Steven Jawgiel
Regional Judicial Officer
United States Environmental Protection Agency,
Region 9

CERTIFICATE OF SERVICE

I hereby certify that the foregoing CONSENT AGREEMENT AND FINAL ORDER in the matter of *Shell Oil Products, Inc.* (MM-09-2018-0001 and OPA-09-2018-0003), signed by the Regional Judicial Officer, has been filed with the Regional Hearing Clerk and was served on Respondent, and Counsel for EPA, as indicated below:

BY FIRST CLASS MAIL:
(Certified w/Return Receipt)

Respondent -                     Marcelo Orgmian
                                 Shell Oil Products
                                 P.O. Box 711
                                 3485 Pacheco Boulevard
                                 Martinez, CA 94553

HAND DELIVERED:

Complainant -                    Rebekah Reynolds, Esq.
                                 Office of Regional Counsel
                                 ENVIRONMENTAL PROTECTION AGENCY
                                 75 Hawthorne Street
                                 San Francisco, CA 94105

Date: May 23, 2018                    Steven Armsey
                                      Steven Armsey
                                      Regional Hearing Clerk
                                      EPA, Region 9

# Exhibit B



REFINING & PROCESSING

# Shell finalizes sale of Martinez refinery

Royal Dutch Shell PLC subsidiary Equilon Enterprises LLC has completed the previously proposed sale of its 157,000-b/d dual-coking refinery and integrated logistics assets at Martinez, Calif., to PBF Holding Co. LLC for $1.2 billion.

Robert Brelsford

Royal Dutch Shell PLC subsidiary Equilon Enterprises LLC (dba Shell Oil Products US) has completed the previously proposed sale of its 157,000-b/d dual-coking refinery and integrated logistics assets at Martinez, Calif., to PBF Energy Inc. subsidiary PBF Holding Co. LLC for $1.2 billion (OGJ Online, June 12, 2019).

Finalized on Feb. 1, the transaction includes sale of the refinery, adjacent truck rack and terminal, existing refinery inventory, crude oil supply, product offtake agreements, and other adjustments, Shell said.

Shell's associated branded fuel businesses, aviation terminal, and catalysts business in the area were not part of this transaction.

As part of the sale agreement, Shell and PBF previously entered market-based, crude oil supply and product offtake agreements to continue supplying Shell-branded businesses, ensuring that Shell customers will continue having access to Shell-branded fuels.

PBF also has offered ongoing employment to local employees of the Martinez refinery.

PBF Energy and Shell said they also will jointly move forward with their previously announced plan to review feasibility of building a proposed renewable diesel project that would involve repurposing of existing idled equipment at the Martinez refinery to create a renewable fuels production plant at the site. Detailed feasibility review and planning for this project are scheduled to remain ongoing despite official closing of the Martinez transaction.

Shell—which plans to maintain a large presence in California with continued investments in its upstream and new energies business—said divestment of the Martinez refinery aligns with the company's strategy to reshape refining efforts towards a smaller, smarter refining portfolio focused on further integration with Shell trading hubs, chemicals, and marketing to drive resilient returns.

By 2025, Shell said it expect to have interests and continue investing in a smaller, core set of refineries, a key advantage of which will come from further integration with Shell trading hubs and from producing more chemicals and other products resilient in a lower-carbon future, such as bitumen and base oils.

The planned Martinez sale follows a series of global downstream divestment initiatives by Shell during the last several years as part of the operator's plan to concentrate its downstream footprint on a smaller number of assets and markets where it can be most competitive (OGJ Online, Apr. 22, 2019).

In a separate release, PBF Energy it paid a purchase price of $960 million plus the value of hydrocarbon inventory for the assets, which it financed with a combination of cash, including proceeds from its subsidiaries' $1-billion private debt offering in January of 2020, as well as borrowings under its existing revolving credit facility.

"The acquisition of Martinez is a significant strategic step for PBF as we expand our [US] West Coast operations. Martinez is a top-tier asset, a perfect complement to our existing assets, and provides increased opportunities for

PBF's [USWC] operations to deliver value," said Tom Nimbley, PBF Energy's chairman and chief executive officer.

With the acquisition, PBF Energy said it has increased its total throughput capacity to more than 1 million b/d to become the most complex independent refiner with a consolidated Nelson complexity index (NCI) of 12.8.

Located on an 860-acre site 30 miles northeast of San Francisco, Calif., the Martinez refinery is a high-conversion complex with an NCI of 16.1, making it one of the most complex refineries in the US. PBF Energy said the refinery's strategic position in Northern California provides for operating and other synergies with subsidiary Torrance Refining Co. LLC's 155,000-b/d refinery in Torrance, Calif.

Alongside the refinery and inventory, PBF Energy took ownership of Martinez's on-site logistics assets, including a deep-water marine terminal, product distribution terminals, and refinery crude and product storage installations with about 8.8 million bbl of shell capacity.

**Source URL:** https://www.ogj.com/refining-processing/article/14092900/shell-finalizes-sale-of-martinez-refinery